## STANDARD INS. CO. v. McKEE.
### No. 2579.

Court of Civil Appeals of Texas. Eastland.
March 28, 1947.

Rehearing Denied April 18, 1947.

Whitaker, Turpin, Kerr, Smith & Brooks, of Midland, for appellant.

Scarborough, Yates & Scarborough, of Abilene, for appellee.

GRISSOM, Chief Justice.

I. R. McKee was employed by the Valley Osage Oil Company to drill its well No. 8 in Shackelford County under a contract partly written and partly oral. The written portion is shown by a letter from McKee to the oil company, the material portions of which are as follows:

"This is to outline Mr. Branscum and my agreement for me to drill a well on your Alexander lease in Shackelford County, Texas.

"I am to drill a well on your lease to the depth of 900 feet, unless oil or gas is encountered at a lesser depth for the price of $2.25 per foot, and $40.00 per 8-hour tour for day work. I will furnish all water, slush pit, fuel, water and 8" and 7" casing, but you are to furnish the oil string and pay for any pipe that is left in the hole. I will carry Workmen's Compensation and Liability Insurance. Drilling is to start within 30 days from this date."

Under the same contract he drilled said oil company's well No. 9, and had nearly completed the drilling of its well No. 10 when, while preparing to sharpen a bit owned by him, his clothing became ignited and he was severely burned. While drilling the wells to the depth of 900 feet, or until oil or gas was encountered at a lesser depth, both the material and labor necessary for drilling the well were furnished by McKee, and he carried workmen's compensation on his employees engaged in drilling the wells. The oil company carried workmen's compensation on its employees with appellant. McKee, claiming to be an employee of the oil company at the time he was burned, brought suit to recover compensation as an employee of the Valley Osage Oil Company under the Workmen's Compensation Law. Vernon's Ann.Civ.St. Art. 8306 et seq. The case was submitted to a jury, and it answered all issues submitted in favor of McKee. It found that McKee at the time he was injured was an employee of the oil company and that he was not an independent contractor. Judgment was rendered for McKee, and the insurance company has appealed.

Appellant presents four points, all of which in effect present the contention that the evidence was insufficient to raise an issue of fact as to whether or not at the

time McKee was burned he was an employee of the oil company; or stated differently, that the evidence showed conclusively, that is, as a matter of law, that at said time McKee was an independent contractor.

We shall assume that until the contract depth was reached or the pay sand was encountered and the oil company's superintendent, Mr. Branscum, arrived at the well that McKee was an independent contractor. Appellee contends that if prior to that time McKee was an independent contractor, nevertheless, after the contract depth had been reached (under which McKee was to drill the well for $2.25 per foot) and when McKee commenced work in the pay sand and began doing those things for which, under the contract, he was to be paid "$40.00 per 8-hour tour for day work", that he was then acting as an employee of the oil company and ceased to act as an independent contractor.

■ Under a comparable situation, our Supreme Court has held that it is necessary in answering the question presented to consider not only the evidence as to the terms of the contract of employment when made but also the testimony with reference to the control actually exercised by the alleged employer. The court said, "It is relevant and admissible as tending to prove what the contract really contemplated". Southern Underwriters v. Samanie, 137 Tex. 531, 155 S.W.2d 359, 362. See also Lloyds Guarantee Assur. v. Sheffield et al., Tex.Civ.App., 170 S.W.2d 327 (Writ Ref.).

In accord with the decisions just cited, we call attention to the following evidence deemed pertinent on the question of the right of control of the alleged employee at the time of his injury and relevant to the question whether or not there was evidence supporting the jury's finding that McKee was an employee of the oil company when he was burned.

H. L. Branscum, Superintendent for the Valley Osage Oil Company, testified as follows:

"Q. Mr. Branscum, you are an experienced oil field man, aren't you? A. Yes, sir.

"Q. You have been at the oil business how long? A. Twenty-four years.

* * * * * *

"Q. You know how that work should be done? A. Yes, sir.

* * * * * *

"Q. And when you get a well on the day basis, like Mr. McKee's here, it is up to you to determine how deep the well shall go, is it not? A. Yes, sir.

"Q. And it is up to you to see that the production is had after you reach the pay zone? A. Yes, sir.

"Q. And with that purpose in mind you take over the operation and the management of the rig? A. Not necessarily the operation and management of the rig.

"Q. And while ago I believe you testified that you told Mr. McKee or his men, whoever was running the rig to pull the tubing out and put it back in? A. Yes, sir.

"Q. You determine that? A. Yes, sir.

"Q. And you determine how that shall be done? A. Yes, sir.

"Q. You are the man who determines when the cement shall go in there? A. Yes, sir.

"Q. And how much cement shall be mixed to make your plug? A. Yes, sir.

"Q. And you tell the men how to put it in the hole and where to put it in, don't you? A. Yes, sir.

"Q. And in making your determination of when the plug shall be drilled and how far you shall go into the pay zone, you give them instructions on that? A. Yes, sir.

"Q. And tell them when to go in the hole and when to come out? A. Yes, sir.

"Q. On this particular morning that Mr. McKee was hurt you saw him in the hotel before he went out there? A. Yes, sir.

"Q. And you told him to go out and get the tools strung up and to go ahead and drill the plug, didn't you? A. Told him to go out and string the tools up and get ready to swab the water off of the formation.

"Q. You told him to get ready to swab the water out? A. Yes sir. To string up the tools and get ready to swab the water out.

"Q. In other words, you figured then that you would be out there by the time they actually commenced the operation? A. That's right.

"Q. Because you felt responsible for the well, if something should happen to it, at this stage of the game didn't you? A. Yes, sir.

"Q. And in your capacity as Superintendent of the Valley Osage Oil Company you wanted to see that production was had? A. Yes, sir.

"Q. After you had gotten down that deep, didn't you? A. Yes, sir."

H. M. Hatfield testified as follows:

"Q. Let me back up and ask it this way then; after the contract depth was reached what did you then do with respect to the development of the well? A. Well, usually drill the plug and acidize and tube the well and put it to pumping.

"Q. Were those the steps that were necessary in order to put it on production? A. That's necessary in that vicinity, because they weren't flowing wells; they were pumping wells.

"Q. Now, in performing those tasks that you have testified about, acidizing and putting it on the pump, who was it that gave you your orders on how to do that? A. Well, in this particular well, number ten—

"Q. Number nine, I am talking about. A. Well number nine, Mr. Branscum.

\*    \*    \*    \*    \*    \*

"Q. Was Mr. Branscum present when the procedure that you have outlined was done? A. He was either present or he would give me orders to do so and so. If he happened to be in town he would give me orders to do so and so and then he would be out in a certain length of time.

"Q. Until Mr. Branscum gave you those orders telling you how to put that well on production did you know what to do? A. Well, it's customary, you never do anything on finishing a well, without orders

from someone that's representing the Company.

"Q. With respect to running the tools in to cut the plug, is that the first step that you make after you—A. After you cement you usually drill the plug.

"Q. All right. Now, was Mr. Branscum there on Number nine, when you cut the plug? A. Yes, sir.

"Q. And what, if anything, did he tell you with respect to how you should cut the plug? A. Just go ahead and drill the plug and after we drilled the plug and run the bailer, then he would tell me how much sand to cut and where he wanted to stop; whether it was deep enough or was not deep enough.

"Q. And after you had done that, then what did you do? A. Well, he put the tubing in; broke the tools down and put the tubing in and put it on a pumping test on a machine for twenty-four hours.

"Q. Whose tubing was that? A. The Valley Osage Company.

"Q. And who was it made arrangements to have the well acidized? A. Superintendent, Mr. Branscum.

\*    \*    \*    \*    \*    \*

"Q. (by Judge Scarborough) Did you give any orders with respect to how the well should be acidized on number nine? A. No, sir.

"Q. Did anyone give any orders? A. Yes, sir.

"Q. Who was it gave those orders? A. The Superintendent.

"Q. And who was that? A. Mr. Branscum.

"Q. All right, now, after the well was acidized what was the next step in putting it on production? A. Run the tubing and rods.

"Q. And was Mr. Branscum present at that time? A. Yes, sir.

"Q. Did you give any orders about how the tubing and rods should be run? A. No, sir.

"Q. Were any orders given? A. Yes, sir.

"Q. Who gave them? A. The Superintendent.

"Q. And who was that? A. Mr. Branscum.

\* \* \* \* \* \*

"Q. Did he exercise any—wait a minute, let me ask it this way: Who gave the orders that were given up until the well reached the contract depth? A. Well, I got my orders from Mr. McKee until we would get down looking for the pay or the lime out in that area which it was producing from and then Mr. Branscum would be around there and whoever was on tour or if I was on he would tell us to watch out for the lime and when we were in deep enough why he would tell us that was deep enough, get ready to set pipe.

\* \* \* \* \* \*

"Q. Now, at the time you cemented the five inch state whether or not Mr. Branscum was there on the lease? A. Yes, sir.

"Q. State whether or not Mr. Branscum told you to do anything with reference to the cementing of the pipe? A. Well, yes, sir; they always tell us how much cement to put in and how much water to load the hole with. We cemented that by hand. We usually put five or six sacks of cement. I don't remember just how many we put in number ten here, but usually about six sacks or eight and then run the tools down on the plug and load the hole with water and then pick the pipe up.

"Q. Now, who told you how much cement to put in that mixture? A. Mr. Branscum.

"Q. And who told you when to run the tools in? A. Mr. Branscum.

\* \* \* \* \* \*

"Q. Now, when you got out there after Mr. McKee had been hurt did you see any evidence on the ground of the fire? A. Oh, I seen a spot out there by the dog house where the fire had burnt off, place about four feet in diameter, I imagine.

"Q. When you got out there to work that night was Mr. Branscum there? A. No. He told me to go out and string up the swab and fill the socket and dress the bit that Mr. McKee got burnt trying to dress there and string up the swab and swab the hole out, swab the water out and which I did and I made one run and was on the second run when he arrived and he was in the dog house door when it blew the swab out. He could not get out. He was in the back end.

"Q. What, if anything, did he tell you to do then? A. Yes, sir.

"Q. I say, what, if anything, did he tell you to do then, after the swab blew out? A. To drill the plug.

"Q. Did you do that? A. Yes, sir.

"Q. What, if any instructions, did Mr. Branscum give you with reference to drilling the plug? A. Well, drill the plug to bottom; had the bottom hole string on; drill the plug out, see; had to plug back, so they could Halliburton the second time; drill the plug out and then bail the water and bail what stuff was in there out and we shut down about two, imagine that night.

"Q. Who told you what to do at that time? A. Mr. Branscum.

"Q. And who told you what time to shut off? A. Well, after we got the plug drilled, I had worked from about seven until about two in the morning, you see, and he told me it would be all right and I told him I would come back the next night and help him out again because he didn't have anyone, which I did.

"Q. Now, when you got back the next night what did you do the next night? A. Bailed the water out. I believe we run the swab a couple of times. Anyway, we bailed the test and it was making just a little water and worked about four hours, I imagine and shut down again.

"Q. Was Mr. Branscum there at that time? A. Yes, sir.

"Q. And what, if anything, did he tell you to do? A. He told me to bail the hole out and test the water and we would let it set awhile and run the bailer until we shut down.

"Q. Was there anyone else there giving orders, other than Mr. Branscum? A. Nobody else but the tool dresser and he didn't give any orders.

\* \* \* \* \* \*

Q. That's not an uncommon thing for the Superintendent to be present to direct

the mixture of the cement to go in the hole? A. Well, they always have a man around to finish the well. It's an evident fact that you never worked on a well in your life, I never did, that the Oil Company didn't have the Superintendent there in charge of setting of your pipe or whatever you are supposed to do when you got down to the pay sand. You took your orders from him. If he was not there he would send the orders or—

"Q. The question was, that is an ordinary and common procedure, isn't it? A. Yes, sir.

"Q. Now then, that's as to the mix of the cement on the top of the ground, how you mix it that we are talking about, is that right? A. Oh, if you cement by hand you usually mix it—we mix it in a barrel or something and run it in the hole and then run the water in on it; if you get a dry hole; if you get water in there you bail the water out.

"Q. The mixture that the Superintendent directs that's up on top of the ground; he looks at it and says it is okeh or not okeh? A. Well, he just says mix so many sacks and put it in there and he takes a chance on it being okeh, like he did out there on that job.

"Q. That's what Mr. Branscum did, he said, 'Mix so many sacks and put it in there'?

\* \* \* \* \* \*

"A. They put it in by hand. It is not unusual. You just mix it and put it in like he wants it put in and that's all there is to it.

\* \* \* \* \* \*

"Q. And what happened from there until you came back, of course you do not know of your own knowledge? A. Well, I know one thing, I was up there when they acidized and they cut the seat out with their acid.

"Q. You remember who was doing the acidizing? A. Chemical Process Company, I believe out of Breckenridge.

"Q. That was not Mr. McKee; it was someone that had been employed for that particular purpose? A. Yes, sir. The Acid Company.

\* \* \* \* \* \*

"Q. Now, in going through, after you were told to drill through, you knew what to do when he told you to drill through the plug? A. I know what to do but I never do it until I get my orders.

"Q. What were his orders? 'To drill through'? A. Well, he had the hole plugged back with sandstone and plugs, and two by fours and plugs and stuff in there when he cemented and swabbed the water out; blew the plugs out and the two by fours and another plug and that left his sandstone and his plugs that he had in the bottom of the hole. He plugged the sand off so the water would not be in it when he acidized. He gave me orders to drill that out of the bottom, which I did.

"Q. When he said 'drill her out to the bottom' you knew what to do, didn't you? A. Why certainly but I never turn a wheel until I get orders when I am working on a well for a Company.

"Q. That is the ordinary practice; when they tell you to drill through the plug, you don't drill through it until they tell you? A. No, sir.

"Q. When he told you to drill through the plug you knew what to do then didn't you? A. Yes, sir.

"Q. You knew how to drill through the plug? A. Certainly.

"Q. And you drilled through? A. Yes, sir.

"Q. Did he try to tell you how you should drill through the plug? A. Oh, no, he didn't tell me how to; he said, 'drill the plug out to the bottom hole string down there and then we will bail it and clean it up', which we did.

"Q. When he told you to, you knew how? A. I knew before he told me but that was my orders from him and you are not supposed, the driller, to finish the well up or do anything without taking orders from the Superintendent for a Company. If you do, you are liable to have your suitcase and going across the hill.

"Q. Well, in that case he told you to drill through the plug and you did? A. Yes, sir.

"Q. And you had your suitcase there when you got through drilling? A. I would have if I had started drilling before he told me; I would have had my suitcase.

"Q. Now then, what was the next thing? A. Well, he told me to bail the hole and clean it up and shut down. I had been out there.

"Q. You knew how to bail the hole? A. Why certainly I knew how to bail the hole.

"Q. And you bailed that? A. Yes, sir.

"Q. He didn't try to tell you how you are supposed to bail, you knew that? A. No. He told me how long to bail; if any water in there to run it a couple of times again and we will get all of that water out and then we will come back tomorrow night.

"Q. And you did that? A. Yes, sir.

"Q. And when you came back tomorrow night what did you do? A. Bailed the hole and tested the water again; worked about four hours and shut down.

"Q. And were you on production then? A. No, sir. That was the last work I did on the job.

"Q. And then do you know who took over when or after you left? A. No, sir. I could not say.

"Q. Who put it on the pump and all of that? A. Could not tell you that. I don't know.

"Q. Is there anything different in the manner in which you completed this well, from the manner in which you complete most wells, as a driller? A. Well, nothing, I guess, of course every Superintendent has his own way of doing things. You might work—I have worked for the Prairie, Sinclair, Associated Producers and Magnolia. I have sat around for twelve hours waiting for orders, would not turn a wheel until I got orders. I drilled a well this Summer for the Magnolia and waited twelve hours for orders. Every Superintendent has a different way of doing things.

"Q. And you as a driller try to do it any way that they tell you to? A. Absolutely. Yes, sir.

"Q. I believe you said that you never drew any pay from the Valley Osage Oil Company? 'A. That's right.

"Q. Such pay as you drew, on both wells, nine and ten, was paid to you by Mr. McKee? A. That's customary. You always get your money from the contractor; the driller does. You don't get it from an Oil Company when you are running pipe or cleaning out, unless you are working for them by the month.

"Q. The question I asked you was, you got your pay from Mr. McKee? A. That's right.

"Q. You did; now, he made your social security deductions? A. That's right.

"Q. And Valley Osage had nothing to do with that, so far as you know? A. As far as I know they didn't.

"Q. Now, in your contracts, where you yourself were the contractor, did your contract provisions contain about day work, so much per foot and then so much per day in bringing it in? A. It is customary in the oil country when you write a contract to drill a well, it is all one contract. It is two separate things. When you write a contract to drill a well—I have had contracts up in Kansas where they take the well a way up the hole there because they had thirty, forty or fifty million feet of gas; blow the tools out and lose your tools and the wire line and they take the contract away up when you test your pipe; pay you so much a day to finish it on down; they paid you all in one check, but all two different separate things.

"Q. The basis of your pay is figured two different ways? A. That's right; it is all in one contract but it is separated two different things; when you finish your contract your day work is paid separate, a different rate and your footage is different from your day work.

"Q. When you are drilling down you can go much faster than you can when you are completing one, isn't that true? A. That depends on the formation; that doesn't have anything to do with it.

"Q. In well number nine and ten, over here? A. Might drill a well here and drill it for seven days and move over here and be seven months drilling it. Depends on your formation and your luck.

"Q. In completion work, where you are about on the sand, you don't have much further to go do you? A. What do you mean 'completion work, when you are about on the sand' ?

"Q. In this case, you said you set your pipe where you thought the lime was or near where you thought the lime was; how much deeper did you drill from where you set the pipe until you went off the job? A. Well, I imagine about twelve or fourteen feet or fifteen feet. Maybe not that much; not over fifteen feet.

"Q. And the day work provision is actually for the protection of the contractor is it not? A. It has just been customary in oil countries when you write a contract, it is all written in one thing, but it is two separate things. When they take charge of it the baby is theirs. When he goes on day work, you lose your tools it is the Company's; if the rig burns down—I have seen Companies have to pay for rigs that burned down, where working, if they didn't have insurance, working daylight.

"Q. But my question was, the day work provision is for the benefit of the contractor? A. What do you mean 'benefit'? Where is he benefitted? He don't get anything from it.

"Q. You don't want to answer my question? A. Well, no, I can't qualify to answer that question, because I don't think it benefits the contractor. It is just a question of when you get so deep and the Company wants to take it over and they won't let you finish the well unless they have a representative there; Superintendent or somebody to have charge of it, so I can't figure out why it would benefit the contractor.

\* \* \* \* \* \*

"Q. By Judge Scarborough: All right, tell us what was said then when you got ready to cement it and who said it. A. Well, Mr. Branscum was there and he said use so many sacks of cement and had them haul it out there; they usually haul out the amount of cement they want to run. It was there on the floor; the cement and put it in there; put the cement in and put the plug in on top. He shoved a couple of cement sacks on top of the plug down in —down on top of the plug of this five inch and we run the tools down on it and loaded the hole with water and we didn't get enough water in, water load on it so as to heave the cement on through the caving; when we picked the pipe up we had trouble getting the cement out. He finally said 'that's good enough' and we shut it down."

John Macon testified as follows:

"Q. After it reached the contract depth, did Mr. McKee give you any further orders then? A. No.

"Q. Who commenced giving the orders at that time? A. Branscum.

\* \* \* \* \* \*

"Q. What, if anything, did he tell you, with respect to what you should do and how you should do it? A. Well, yeah, he told me how deep to dig it and whether to make another run or not; where to set the pipe.

"Q. He give you any instructions with reference to the placing of the casing? A. Yes, sir. Told me right where to set it.

"Q. Did you stay on on the day work on number nine? A. Yeah, I pumped a tour for him.

"Q. And while you were pumping that tour on nine, after the well had reached its contract depth, who was it that told you what to do and when to do it? A. Branscum.

"Q. Now, were you also on ten, when ten started down? A. Yes.

"Q. And how far down was ten when you quit? A. We were running the pipe; five inch pipe.

"Q. Whose pipe was that five inch? A. Well, it was Branscum's I suppose; the Oil Company.

"Q. Valley Osage Oil Company? A. Yes, sir. Oil Company.

"Q. Did Mr. Branscum give you any instructions on how to set that pipe? A. That's right.

"Q. And what, in particular did he tell you about the method and manner of putting that five inch pipe in the hole? A. Well, he stopped me. I was drilling. I drilled a few feet after I came on tour. He told me where to stop to get ready to run the pipe. He also told me that he wanted the pipe made up tight.

"Q. Made up tight? A. Yes, sir.

"Q. Now, when you put that casing in the hole you have to screw it together in joints? A. Yes, sir.

"Q. And you were putting the Valley Osage five inch in the well, number ten? A. Yes, sir.

"Q. At the time that Mr. Branscum told you to screw the joints tighter? A. Yes, sir."

I. R. McKee, plaintiff, testified:

"Q. Did you have such an arrangement with the Valley Osage Oil Company last Fall? A. Yes, sir.

"Q. How many wells did you drill for the Valley Osage Oil Company before you got hurt? A. We were on the third well.

"Q. And what were the numbers of those wells? A. Eight, nine and ten.

"Q. Now, in doing this work with Valley Osage Oil Company was your contract partially oral and partially written? A. Yes, sir.

* * * * . * *

"Q. You completed eight, well number eight on this deal and they paid you for it? A. Yes, sir.

"Q. And number nine? A. Yes, sir.

"Q. Under this same arrangement? A. Yes, sir.

"Q. And had virtually completed ten when you were hurt? A. Yes, sir.

"Q. And they paid you on ten? A. Yes, sir.

* * * * * *

"Q. And the five inch which was put in, which was the oil string, whose was that? A. Valley Osage.

"Q. Valley Osage Oil Company? A. Yes, sir.

"Q. Now, when you reached the contract depth, or since you didn't go the nine hundred feet, why was it you stopped at 880? A. I stopped on Mr. Branscum's orders. We had found the top of the pay there and that was what he was looking for.

"Q. And he told you to stop? A. Yes, sir.

"Q. And after he told you to stop, what, if anything, did you do towards putting the oil string in there?

* * * * * *

"A. Drilled in the top of the lime where the lime pay was and he said 'set the five inch'.

"Q. Mr. Branscum did? A. Yes, sir.

"Q. And after he told you to set the five inch did you set it? A. Yes, sir.

"Q. And what, if anything did you do towards putting the well then on production? A. Well, he wanted the five inch cemented and he directed the cementing of the five inch string of pipe, by hand, we call it.

"Q. Cemented it by hand? A. Yes.

"Q. And who was it that told you how to cement the five inch at that point? A. Mr. Branscum.

* * * * * *

"Q. Now, the day work that was done, did you issue any orders at all on how that day work should be done? A. No, sir.

"Q. Who did issue the orders that were issued in doing the day work? A. Mr. Branscum.

"Q. You paid the man who did that day work did you not? A. Yes, sir.

"Q. And that was included in the $5.00 an hour that the Valley Osage paid you? A. That's right.

"Q. Was that the same way that you ran number nine? A. Yes, sir.

"Q. And was that the same way that you ran number ten up until the time you got hurt? A. Yes, sir.

"Q. How far along on your work had you gotten on number ten before you got hurt? A. The well had been cemented and acidized and the cement didn't hold and he called Halliburton to recement it and we let it set a few hours, maybe forty-

eight or something like that and then Mr. Branscum told me to go out and pick the tools back up; dress a bit and get ready to re-drill the plug.

"Q. That was when you got hurt? A. And that's the morning I got hurt.

"Q. What arrangements did you have with Mr. Branscum, if any, towards notifying him when you reached the contract depth? A. Well, we notified—he asked me to notify him when we had set the first string or possibly a hundred feet above the pay.

"Q. Did you so notify him on number ten? A. Yes, sir.

"Q. And after notifying him that you were getting near the pay did Mr. Branscum then appear on the scene? A. Yes, sir.

"Q. And what was your depth that you quit on in that well, if you remember? A. We set the pipe at 881 I believe or thereabout.

"Q. That was the top of the pay? A. Yes, sir.

"Q. And that 881 was what you collected your footage on? A. Yes, sir.

"Q. Now, how much longer, after you reached the 881 feet was it until you were hurt? A. Well, we cemented the pipe by hand or attempted to and drilled it out and ran the tubing for the acid; you acidize through the tubing and we washed the seat out from under the pipe.

"Q. About how long, three or four days? A. Yes, sir.

"Q. Was it approximately that long? A. Yes, sir.

"Q. What I am getting at is, approximately how much day work did you collect for after reaching 881 feet until you were hurt? A. Well, I hadn't—hadn't been any bills turned in for anything up to that time.

"Q. Approximately how much day work did you have coming then after reaching 881 feet until the time you got hurt? A.. Seems to me like about two tours or possibly three.

"Q. Two or three tours? A. Yes, sir.

"Q. In other words, the contract depth and the footage depth were reached at the 881? A. Yes, sir.

* * * * * *

"A. In cementing, I was uneasy about us cementing that well by hand, and when we got that pipe down, on the first job, I suggested, could not help but suggest that we get Halliburton on that job.

"Q. Did he follow your suggestion? A. Well, he thought pretty seriously about it and I thought he was going to do it and he said, 'No, we will cement it'.

"Q. Now, at that time and at all times following your reaching the contract depth did you know at any time before hand, what you were going to do until he told you how to do it? A. No, sir.

"Q. Now, when he did cement the well, who gave the orders as to how much further you should drill? A. Mr. Branscum.

"Q. And who gave the orders on which you should run the tubing and rods in the well? A. Mr. Branscum."

■ From all of the decisions it is apparent that the recognized test used to determine whether or not a person is an employee is the right to control the manner and method in which the alleged employee performs the work at the time in question. Smith Bros., Inc., v. O'Bryan, 127 Tex. 439, 94 S.W.2d 145, 148; Dennis et al v. Texas Employers' Ins. Ass'n, Tex.Civ.App., 116 S.W.2d 492 (Writ. Dis.); Liberty Mut. Ins. Co. v. Boggs et al., Tex.Civ.App., 66 S.W.2d 787; Hilgenberg et al. v. Elam, Tex.Sup., 198 S.W.2d 94.

■ The principles involved in determining what constitutes an independent contractor and an employee are so well established that we do not deem it necessary to restate them here. We have given careful consideration to the authorities cited and the evidence. The testimony quoted and other evidence of like import, we think, is sufficient to raise a question of fact as to whether or not McKee was an employee of the oil company when he was burned. See Ætna Life Ins. Co. v. Culvahouse, Tex. Civ.App., 10 S.W.2d 803, 806; Century Indemnity Co. et al. v. Carnes, Tex.Civ. App., 138 S.W.2d 555, 559; Corrigan, Lee

& Halpin v. Heubler, Tex.Civ.App., 167 S. W. 159, 161; Texas Reciprocal Ins. Ass'n. v. Latham, Tex.Civ.App., 72 S.W.2d 648, 649; Blankenship v. Royal Indemnity Co., 128 Tex. 26, 95 S.W.2d 366, 369; Industrial Indemnity Exchange v. Southard, 138 Tex. 531, 160 S.W.2d 905, 907.

The judgment is affirmed.