W. L. PICKENS V. GERALD A. HARRISON ET AL

No. A-3602. Decided October 22, 1952.
Rehearing overruled December 3, 1952.
(252 S.W., 2d Series, 575.)

*Andrews, Kurth, Campbell & Bradley, Hamblen & Bobbitt, Raymond A. Cook, James F. Bobbitt, A. C. Lesher, Jr.,* all of Houston, *Robt. Lee Bobbitt,* of San Antonio, *Prentice Wilson,* of Dallas, and *Dan Moody,* of Austin, for petitioner.

The Court of Civil Appeals erred in affirming the tria court's judgment upon the jury's verdict in the absence of a finding by the jury on the ultimate fact issue as to whether or or not any salt water from the oil well reached the irrigation well, and reached there with sufficient quantities and with sufficient saline content, when mingled with 3400 gallons per minute of irrigation water, to damage rice. Fox v. Dallas Hotel Co., 111 Texas 461, 240 S.W. 517; Erisman v. Thompson 140 Texas 361, 167 S.W. 2d 731; Ormsby v. Ratcliff, 117 Texas 242, 1 S.W. 2d 1084.

*Fulbright, Crooker, Freeman & Bates, Leon Jaworski, Austin C. Wilson* and *W. H. Davidson, Jr.,* all of Houston, *Sample & Bell,* and *W. H. Hamblen,* both of Edna, for respondents.

Petitioner, Pickens, having admitted that he emptied salt water from his oil wells into pits dug into the water sand and into open ditches which flowed into neighbor creeks which permitted it to be absorbed by the water bearing sands which would carry it to plaintiff's well, and the jury having found in answer to appropriate issues and definitions that each of said acts constituted negligence and the jury having further found that each of said acts was a proximate cause of the damage complained of, petitioner's contentions must be overruled. City of Panhandle v. Byrdd, 130 Texas 96, 106 S.W. 2d 660; Norton v. Caster, 125 Texas 48, 81 S.W. 2d 487; Turner v. Big Lake Oil Co. 128 Texas 155, 96 S.W. 2d 221.

Mr. Justice Griffin delivered the opinion of the Court.

Respondents, Harrison and Combs, filed this suit in the District Court of Jackson County, Texas, against petitioner seeking damages as a result of an alleged pollution of water in respondents' irrigation well and which water, it was alleged, had become salty as a result of such negligent acts of petitioner, and had damaged a rice crop which Harrison, as tenant, had growing on Combs' land during 1949. Respondents sought damages both to Harrison's leasehold estate, and Combs' ownership

of the land. Upon a jury verdict answering special issues, the trial court gave judgment for respondents against petitioner and this judgment was affirmed by the Court of Civil Appeals at Galveston. 246 S. W. 2d 316.

Petitioner comes before this court with eight points of error to the holding of the Court of Civil Appeals. Our decision in Landers v. East Texas Salt Water Disposal Co., 151 Texas 251, 248 S. W. 2d 731, decided while this cause was pending on application disposed of the 8th point adverse to petitioner's contention, and the 8th point has not been urged in argument, or the briefs filed by petitioner.

Petitioner's remaining points of error may be grouped into the following contentions:

(1) There being no findings by the jury on the ultimate fact issues necessary to a recovery by respondents (a) whether or not any salt water from petitioner's wells reached respondents' irrigation well, and (b) reached there in sufficient quantities, and (c) with sufficient saline content when commingled with the irrigation water coming from the well to damage growing rice, no judgment could be rendered against petitioner. (2) There is no evidence to support the jury's finding on proximate cause. (3) There is no evidence to support the recovery for future damages as to permanency of the alleged contamination, and (4) Right of lessee Harrison to recovery for contamination of water sands occurring prior to date of respondent Harrison's lease contract, and (5) There was a double recovery given by the trial court.

We have carefully read and studied the 1269-page statement of facts, the 214-page Volume of the documentary exhibits, and the some 50-odd maps, cross-sections and plats, which constitute the record of the evidence introduced upon the three-weeks trial of this cause. In addition we have examined and studied the elaborate peg model of the 45-core holes, and which purports to show the elevation of the holes and the thickness of the first sand in each hole. To detail the evidence at any length would make this opinion entirely too long. We will endeavor to summarize this mass of testimony so as to bring out the high points of the evidence viewed from the standpoint of respondents in accordance with well recognized rules of law.

It is fundamental that the rule to be applied is "if discarding all adverse evidence and giving credit to all evidence favor-

able to the plaintiff and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff, then there was evidence to support their verdict." Cartwright v. Canode, 106 Texas 502, 507, 171 S.W. 696; Underwood v. Security Life and Annuity Company, 108 Texas 381, 194 S.W. 585; Montgomery Ward & Co. v. Scharrenbeck, 146 Texas 153, 204 S.W. 2d 508; Liedecker v. Grossman, 146 Texas 308, 206 S.W. 2d 232; 3 B Tex. Jur., p. 443, Appeal & Error Civil Cases Sec. 935; and authorities cited therein.

The evidence showed that Harrison had an eleven-year lease on Combs land, beginning December 15, 1948. Immediately thereafter he drilled and equipped an irrigation well on this land and prepared the land for irrigation at a cost of $25,000.00 and planted a rice crop for year 1949. The land was very fine rice land and was the same as sod. The land was properly prepared for the crop and the seed sowed in April and May of 1949 and came up to a very fine stand—one of the best in that vicinity. The crop was of a fine, healthy color and when watered the crop grew and flourished abundantly. After a flooding of water from the irrigation well about the first of July, the tops of the stalks began to turn reddish brown and rust colored, the plant began to look sick, and stopped growing. The stalk did not boot out, nor the head fill as it should. As each plot of ground would be irrigated the crop would begin to show damage. This deterioration continued until the crop was harvested in the fall. It was stipulated as to the number of barrels of rice actually made on the 359.7 acres in rice, and which could be irrigated from this well, and also the price which was received for the rice. When the rice first began to burn and show evidences of damage, about July 13, 1949, respondent consulted a Dr. Wyche, of the Rice Experiment Station of Texas A. & M. College, who inspected the crop and recommended the application of certain fertilizers which respondents applied promptly and in the best recognized manner and method. This application did not benefit the crop, and it continued to deteriorate. Dr. Wyche testified that after examining the land, the way the rice had been planted and cultivated, the appearance of the rice after it began to show deterioration, and the failure of the crop to respond to the fertilizer, he saw no other source of the damage except water from the irrigation well, and that he did not know of any cause for the damage other than salt water from the well. Other witnesses testified as to the crop before and after the damage, that when the well was first completed it produced good water that tasted

a little soft and was fine drinking water. Respondent Harrison and witness Clark testified that after the rice started dying and "firing up" and fertilizer had been put on the crop (and to no avail) then they tasted the well water for the first time since it had been started pumping and the water tasted salty. This occurred about August 20, 1949, and at this time a test was made by these witnesses by dropping a few drops of silver nitrate solution in a sample of the well water, and that this produced a heavy blue cloud in the water. All scientific witnesses for both sides who testified said this was a sign that there was salt in the water sample and all agreed that the heavier the concentration of salt in the water the darker would be the cloud formed. Harrison and Clark (who had an interest in the 1949 rice crop under Harrison, and who did most of the actual working of the crop) testified that they were unable to get water from any other source than the irrigation well, and they continued to flood the crop from this well even after they believed the water had become contaminated with salt, because had they not done so, the crop would have produced no rice. Other witnesses testified to the good land, the good preparation for the crop, the fine stand of rice and its excellent condition until in July 1949; to the appearance of the crop after July, and that the crop then had the appearance caused by flooding with salt water.

The evidence as to the source of contamination was as follows: About two miles in a general northeasterly direction, in November 1943 the Little Kentucky Oil Field was brought in by petitioner. Huseman No. 1 well began making approximately 15% salt water about three weeks after it was brought in (this would fix the date as approximately December 1, 1943). This well increased its output of salt water in 1944 to 25% and in 1945 to 80%, which latter figure was 150 to 165 barrels per day. In 1949 the output of salt water had increased to 92% or approximately 460 barrels per day. Petitioner had other oil wells making some salt water on the Kramer & Chernosky leases and which was put into Lunis Creek. (The Harrison irrigation well was located about 6000 feet west from this creek.) From the beginning of production until June 1949 this salt water was run into a borrow ditch which took it to Lunis (or Looney's) Creek. The creek ran generally in a north and south direction across a part of the Combs tract. It was estimated that about 495,000 barrels and in excess of 20,000,000 gallons of salt water had been disposed of down this borrow ditch and Lunis Creek during the six years this method of disposal was used. The general slope of the surface of the ground and the run-off of rain

was in a southerly direction. Lunis Creek was a dry drainage canal of varying depths but around 10 to 20 feet deep as it ran through the Combs land. In May 1949 complaint was made to the Railroad Commission of the emptying of the salt water into Lunis Creek and the Commission notified petitioner that he was violating Rule 20 (which petitioner and his agents in charge of the production in Little Kentucky Field testified they knew existed) and ordered him to desist from further pollution. One of petitioner's agents saw the local representative of the Railroad Commission and told him they would stop the then method of disposing of the salt water, and about June 17th petitioner completed a disposal pit about 25 x 25 feet square in the bottom and about 13 feet deep into the ground at Huseman No. 1 well. Other pits were completed for Kramer & Chernosky wells. Petitioner's witness Nick Martin testified that with the knowledge and consent of his superiors who represented petitioner in this field, he sank on their ends two concrete tile pipes two feet in diameter and three feet long into the bottom of the of the Huseman pit. This was done to promote absorption of the water into the sand which the pit had reached, and which was referred to by all witnesses as the "first sand." Beginning June 17, 1949 petitioner ran the salt water from the Huseman No. 1 well into that pit, and it was about full June 28th and the well was shut down, and after an unsuccessful attempt by petitioner to shut off the salt water the well was abandoned and plugged. It was testified that about 5000 barrels of salt water, or approximately 200,000 gallons, went into the pit during the ten days of its use by petitioner.

Three witnesses who had drilled core holes into the first water sand, and one into the second water sand, testified in the case. The first sand was at depths varying from 10 to 16 feet, while the second sand ran about 28 to 32 feet. Each witness took water samples from each sand tested, where the sand was not dry, and the samples were analyzed by competent chemists for sodium chloride (salt) content, and the reports of such analysis were introduced in evidence. The first witness (respondents) took his coring the latter part of October and early in November of 1949. During the first part of October 1949 the rainfall in this vicinity was from 9.34 inches to a high of 14.85 inches, and the total October rainfall was from 15.55 to 22.66 inches. All scientific witnesses said that heavy rains would pass into the first sand and dilute the salt content. The salt content of the corings near Lunis Creek as shown by first witness, and in the first two sands were from 4440 parts of salt per million parts

of water, near the Huseman, Kramer & Chernosky pits, to 320 p.p.m. near the Harrison irrigation well. The core holes closest to Lunis Creek and on or nearest to the rice field on the Combs land showed 2300 p.p.m. and 3561 p.p.m. The second witness (who was petitioner's witness) made his corings and took his samples from December 21, 1949 through March 11, 1950, and the chloride (salt) content in each comparable location ran from 31,350 p.p.m. near the Huseman pit, to 500 near Harrison's well. The comparable readings along Lunis Creek were 2500 p.p.m., 1500 p.p.m., and 1250 p.p.m. The third witness (petitioners') made his corings in November 1950 and the chloride content ran from 41035 p.p.m. inside Huseman pit, to 110 and 219 p.p.m. near Harrison's well, and along Lunis Creek on Combs land, 16970, 4265, and 1595 p.p.m.

The irrigation well was 26 inches in diameter and about 500 feet deep. Inside this hole was an 18 inch steel casing down to about 225 feet and from there on to the bottom was 12 inch steel casing. Between the outside of the casing and the wall of the well was poured coarse gravel so that the water from the various sands could percolate down and be picked up by the pump. The casing was not perforated for 109 feet, which was the pump setting, but below this level there were holes cut in the sides of the casing opposite each water-bearing sand. One of petitioner's witnesses testified that the first sand was continuous from the Little Kentucky Field down to Harrison's well. A ground water expert testifiying for respondents, in answer to a proper hypothetical question testified that the salt water from the Huseman pit percolated through the water sand and contaminated Harrison's well. One of petitioner's witnesses testified that he could not think of any place except the Huseman pit where the salt water contamination could come from. Respondent Harrison testified that as soon as he discovered his well had turned salty that he rode around over his neighborhood, and a wide scope of the surrounding country, looking for sources of contamination, and there was no other source of contamination which he could find except the pits in the Little Kentucky Field. No witness could give any other source of contamination.

[1] We believe that the record contains evidence to support the jury's findings that petitioner polluted the fresh water sands with his salt water, and that such pollution reached the Harrison well and was a proximate cause of the damages suffered by respondents. This recitation of the evidence also refutes all the assignments which petitioner has that there is no evidence to

support the jury's findings on proximate cause, and future damages. All the "no evidence" assignments are overruled.

Petitioner further contends that no judgment can be entered against him because there were certain ultimate fact issues necessary to a recovery by respondents, which were not submitted to the jury, thus precluding any recovery by respondents. This contention urges that the submission of an issue of "proximate cause" after each issue of petitioner's negligence, in the orthodox way set out in Wichita Falls & Okla. Ry. Co. v. Pepper, 134 Texas 360, 135 S.W. 2d 79, was not sufficient finding on the ultimate issue of causation; but such question of causation, under the facts of this particular case, should have been broken down into the component elements necessary to fix liability on petitioner. Petitioner states his views in his supplemental brief clearly and pointedly as follows:

"* * * The postulate is this: When under a complex fact situation one particular issue out of those composing 'cause in fact' becomes itself a controlling issue on which the whole case turns, that issue must be separately submitted. This postulate is a logical and necessary result of the axiom that a litigant is entitled to a separate submission on all controlling issues. The separate submission of a controlling issue of cause in fact leaves unaffected the submission of foreseeability and the other non-controlling issues of cause in fact."

Petitioner therefore contends that subdivisions (a), (b), and (c) of Point (1) stated under our summary of his points of error, each constitute an ultimate issue, and therefore required a jury finding in favor of respondents on each subdivision before any judgment against petitioner could be rendered. The learned trial judge in his charge gave the following instructions:

"By the term 'proximate cause' as used in this charge is meant a cause which in a natural and continuous sequence unbroken by any new and independent cause, produces an event and without which the event would not have occurred. And to be a proximate cause of an event, it should be such a cause that it could have been reasonably anticipated and foreseen by a person of ordinary prudence in the exercise of ordinary care that the event or some similar event would result from such cause as a natural and probable consequence. There may be more than one proximate cause of an event, but there can be only one sole proximate cause of an event.

"By the term 'new and independent cause' as used in the foregoing instruction defining 'proximate cause' is meant the act or omission of a separate and independent agency which destroys the causal connection between the negligent act or omission, if any, of the defendant or defendant's agents and the injury, if any, complained of, and thereby becomes, in itself, the immediate cause of such injury.

"You are instructed that by the term 'natural' as used in the foregoing instruction defining 'proximate cause' is meant normal or in accordance with ordinary experience and by the term 'continuous' as used therein, is meant without break, cessation or interruption, and by the word 'sequence' as used therein, is meant succession or that which follows as a result."

Petitioner has brought forward no objections or complaint of these instructions.

Petitioner cites no cases in point to sustain his complaint, and we have found no such case. There are certain well established rules of law which we believe sustain the trial court's manner and method of this submission.

2 Rule 279 Vernon's Texas Rules of Civil Procedure provides in part "When the Court submits a cause upon special issues, he shall submit the controlling issues made by the written pleadings and the evidence * * *. Where the court has fairly submitted the controlling issues raised by such pleading and the evidence, the case shall not be reversed because of the failure to submit other and various phases or different shades of the same issue. * * *."

Two submissions of the same issue are never required. Commercial Standard Ins. Co. v. Shudde (T.C.A.), 76 S.W. 2d 561, aff. no written opinion, wherein it was held that in a personal injury case containing a proper definition of "negligence," the court should not define the term "proper lookout," as such definition if given would be twice submitting the issue of negligence. Little Rock Furniture Co. v. Dunn, 148 Texas 197, 222 S.W. 2d 985 (3-5). In City of Panhandle v. Byrd, 130 Texas 96, 106 S.W. 2d 660, it was held that when the court submitted the issue of proximate cause, and defined that term so as to include "foreseeability," an additional issue inquiring as to "foreseeability" should not have been given. The case was reversed because of a conflict in the jury's answer to the two issues. The reasoning of the Byrd case sustains the trial court's action in the present

cause. Wichita Falls & Okla. Ry. Co. v. Pepper, 134 Texas 360, 135 S.W. 2d 79, 84 has come to be recognized as the leading case setting out the rules of law applicable to submission of ultimate fact issues. The method of submission of a negligence case there suggested was the one following in the case at bar. In Hough v. Grapotte, 127 Texas 144, 90 S.W. 2d 1090, complaint was made that the trial court erred in submitting special issues on domicile, rather than submitting what it was contended the real ultimate issues involved in domicile, to wit (1) residence and (2) intention to make the residence home. Such contention was overruled by the following language: "The question has been many times determined contrary to this contention. Multiplicity of issues should be avoided and only those ultimate issues submitted which will form the basis of a judgment. The issues of residence and intention are merely elements of the controlling issue of domicile and were included in and disposed of by the answer to the more comprehensive issue." In Howell v. Howell, 147 Texas 14, 210 S.W. 2d 979, complaint was made because the trial court in that divorce case had submitted to the jury one issue only as to "the acts or conduct of defendant toward the plaintiff, if any, constituted (constituting)) such excesses, cruel treatment or outrages of such a nature," etc. etc. The Court of Civil Appeals certified the question if such submission, under the statute and facts of that case, was correct. We held such submission good, and said that the issue submitted covered the one ultimate issue of fact in the case. Further, this court said:

"The issue to be determined is the total effect of the defendant's conduct considered in the light of all the evidence. This in many cases will require the jury to consider a number of facts, but a 'group of facts' may constitute the ultimate issue rather than one single fact, See Fox v. Dallas Hotel Co. 111 Texas 461, 475, 240 S.W. 517, 522. Where as in this case, the one ultimate issue embraces a number of subsidiary facts, it is not improper to include in the issue these several facts, * * *."

The last sentence fits our situation perfectly. The ultimate issue of proximate cause in this case includes the subsidiary facts of (a) whether any salt water from petitioner's oil well reached respondents' irrigation well, (b) if it reached there in sufficicient quantities, and (c) with sufficient saline content when mingled with the fresh water to damage the growing rice. Those were evidentiary facts included within the ultimate fact of proximate cause. See also City of Houston v. Lurie, 148 Texas 391, 224 S.W. 2d 871, 14 A.L.R. 2d 61; Dallas Ry. & Terminal Co. v. Bailey, 151 Texas 359, 250 S.W. 2d 379, wherein we held that

when the court included the term "new and independent cause" in its definition of proximate cause, and defined "new and independent cause," it should not submit a separate issue on new and independent cause.

See also Meadowlake Foods Inc. v. Estes, (TCA), 218 S.W. 2d 862, error ref. N.R. E., 219 S.W. 2d 441; Ft. Worth & D. C. Ry. Co. v. Capehart (T.C.A.) 210 S.W. 2d 839, writ ref., N.R.E.; Phoenix Ref. Co. v. Tips, 125 Texas 69, 81 S.W. 2d 60; Dakan v. Humphreys, (TCA, Co. Ct. case) 190 S.W. 2d 371; Werner v. Brehm, (TCA) 216 S.W. 2d 991, writ ref. N.R.E. We overrule petitioner's points of error as to necessity of breaking down issue of proximate cause, and hold that the trial court correctly submitted such issue.

3 Petitioner complains that Harrison has been permitted to recover damages for injury to the land, prior to the date of Harrison's lease. The answer to this contention is that the evidence will support the fact that the irrigation well, when first brought in and operated was a good well, and there was no salt contamination, but that such contamination arose after Harrison had been using the irrigation well and pumping water therefrom, and this was the time of the injury suffered by Harrison.

Prior to the submission of the court's charge, petitioner objected to special issues Nos. 13 and 14 and 15 and 16 on the grounds that same would permit plaintiffs (respondents) to have a double recovery of damages. Issues 10 thru 12 had to do with the 1949 crop. Issue No. 13 reads as follows:

"Do you find from a preponderance of the evidence that the value of the use of plaintiff Gerard A. Harrison's leasehold interest in the land in question has been reduced by any of the acts of the defendant heretofore inquired about?

Answer 'Yes' or 'No'."

The jury answered this issue "yes". Issue No. 14 was as follows:

"What do you find from a preponderance of the evidence to be the amount by which the value of the use of the leasehold interest of plaintiff Gerald A. Harrison in the land in question has been reduced?

Answer in dollars and cents, if any."

The jury answered this issue $49,160.00. Issue No. 15 was as follows:

"Do you find from a preponderance of the evidence that the rental value of plaintiff C. F. Combs' interest in the land in question has been lessened by any acts of defendant heretofore inquired about?

Answer 'Yes' or 'No'."

The jury answered "Yes" to this issue. Issue No. 16 is as follows:

"By what amount, if any, do you find from a preponderance of the evidence, that the rental value of plaintiff C. F. Combs' interest in the land in question was reduced? Answer in dollars and cents, if any."

To this issue the jury answered $13,600.00.

A reading of Special Issues Nos. 13 thru 16 clearly demonstrates that any injury suffered to Harrison's "leasehold interest" and Combs' "interest" in the land for the year 1949 is included in the issues. The evidence shows that the first evidence of any damage to the rice crop was noticed about July 1, 1949. Respondents continued to use the water from the irrigation well to water the crop as needed to mature this crop. The rice crop was harvested in October, 1949. Therefore whatever damage was done began prior to July 1, 1949, and prior to the harvesting of the 1949 crop. To our mind, Issues Nos. 13-14 which inquire as to lessened value of respondent Harrison's leasehold interest in the land in question being reduced, and which imposes no time limitation upon such reduction, must of necessity include 1949 damage, or lessening of the leasehold interest. There being no limitation or exclusion as to the damage done, the issue must cover all damage done, and there is no sound basis for excluding any portion of such damage under the plain wording of the issue. By the wording of the issue, the jury were affirmatively instructed to include all damage done in their answers sought.

4, 5 In inquiring as to the lessened rental value of respondent Combs' interest in the land in question, we likewise find no limitations or restrictions on the jury. Since the evidence shows the damage causing the lessened rental value of Combs' interest occurred before the harvesting of the 1949 crop, and since the issues 15 and 16 cover the whole of such damage, the jury were bound, under the issues as worded, to include 1949 lessening of rental value. However, issues 10 thru 12 specifically have to do

with both Harrison and Combs' interest in the 1949 rice crop. If respondents' suit is one for permanent damages to the land, the measure of damages is the decreased value of the land, and no recovery for the land's rental value is permitted. Neither could Harrison recover anything for permanent damages to the land. 27 Tex. Jur. 340, Landlord & Tenant, Sec. 201. "To permit a recovery of the market and rental value (permanent injury) in one case would permit a double recovery for the same damages." Lone Star Gas Co. v. Hutton, Texas Com. App. 58 S.W. 2d 19 1. c. (6-8) 21. In their pleadings respondent Harrison alleges the contamination of the irrigation well and the water sands under the leased premises and alleges that such contamination has utterly destroyed his leasehold estate and rendered same valueless, and for this item of damages he asked the sum of $75,000.00 which he alleged was the "fair and reasonable value" *of the leasehold estate prior to such contamination.* Respondent Combs makes similar allegations as to the salt water contamination and further "that the reasonable value of the interest of plaintiff Combs in and to said land, *as the owner and lessor in the rice farming lease to plaintiff Harrison"* before the contamination was $100,000 and afterwards the value was only $60,000.00, and alleges that by reason of defendant's (petitioner's) negligent acts "the value of plaintiff Combs' interest in said land *as the owner and lessor of said rice farming lease* was reduced by the amount of $40,000.00 * * *." (Emphasis added). Next respondent Harrison alleges damages for loss of profits of $75,000.00 for the remaining ten years of the lease, and by similar allegations Combs asks for $40,000.00 damages for rental he would have realized under the lease for the remaining ten years of the tenure. These last allegations would have supported a judgment for the amount rendered, but no issues were submitted to the jury under these last allegations, and such being true, these particular grounds of recovery were waived, and cannot support the judgment rendered. Wichita Falls & Oklahoma Ry. Co. v. Pepper, 134 Texas 360, 135 S. W. 2d 79. Respondents elected to go to the jury upon the allegations of injury to the land for the full term of the lease, i. e. only a temporary injury. The issues submitted covered the whole term of the lease, and, of course, the amount of money given by the jury in answer to the appropriate collateral issue included all injuries for the full term of the lease. Therefore there has been a double recovery as far as the year 1949 is concerned.

**6** Respondents urge that petitioner did not properly raise this issue in the trial court, and therefore cannot raise it now. Res-

pondents cite cases holding that an objection to the court's charge which merely says the issues permit "a double recovery" is insufficient to preserve the point. There is no quarrel with that statement of the law. However, petitioner had more than the above statement in his objections. We must consider the charge as a whole. Texas Employers Ins. Ass'n. v. McKay, 146 Texas 569, 210 S. W. 2d 147. While petitioner could certainly have been more specific in his objection, we have concluded that the objections taken as a whole were sufficient to preserve the point on appeal, when properly brought forward. Petitioner has properly preserved this point on appeal.

7 Having demonstrated that the jury in answering Special Issues Nos. 13-16, both inclusive, necessarily included the 1949 damages, and the jury having found that the amount of 1949 damages totaled $31,356.00, we have no hesitation in holding that the error in the special issues did cause the rendition of an improper judgment against defendant. His rights were certainly prejudiced to the extent of this $31,356.00 and which is a most serious wrong done him. This could not be held to be a "harmless error" that probably did not cause the rendition of an improper judgment. From a calculation of the answers given by the jury to the appropriate special issues controlling the damages suffered on account of injury to the 1949 rice crop, the trial court awarded to respondent, Harrison, the sum of $28,568.80 for his damages to the 1949 crop. To respondent, Combs, was awarded the sum of $2,787.20 for his damages to the 1949 crop. From these facts we can determine exactly the amount of double recovery for each of the respondents. Deducting these items from the judgment of the trial court, gives us the sum of $49,260.00 recovery in favor of Harrison, and the sum of $13,700.00 recovery in favor of respondent, Combs.

The judgment of the trial court is hereby modified to read that Gerard A. Harrison do have and recover of and from W. L. Pickens the sum of $49,260.00; and that C. F. Combs do have and recover of and from W. L. Pickens the sum of $13,700.00, Except as modified above, the judgments of both courts below are hereby affirmed.

Opinion delivered October 22, 1952.

MR. JUSTICE CALVERT joined Justice Smedley, dissenting.

I dissent from that portion of the majority opinion dealing with the amount of damages awarded the respondents and from

that portion of the judgment reforming the judgment of the trial court.

The majority holds that both of the respondents, Combs the landlord and Harrison the tenant, have recovered double damages; and, based upon the holding that "we can determine exactly the amount of double recovery for each of the respondents," proceeds to reform the trial court's judgment by eliminating the sum of $28,568.80 from the judgment running in favor of Harrison and the sum of $2,787.20 from the judgment running in favor of Combs. These items of recovery represent the pecuniary loss found by the Court and the jury to have been sustained by the respondents from damage to their 1949 rice crop. The theory on which the items are eliminated is that they *are included in other items of damages awarded the respondents.*

An analysis of the record will reflect that the judgment actually decrees a double rcovery *only* if the jury actually awarded 1949 crop damage to Harrison in answer to special issue No. 14 and to Combs in answer to special issue No. 16. I submit that we do not and at this stage of the proceedings cannot know that the jury did, in fact, include 1949 crop damage in its answers to those issues. I submit further that it is only by the wildest stretch of the judicial imagination that the precise amount of 1949 crop damage, if any, included in the jury's answers to issues Nos. 14 and 16 can be determined.

It seems to me that the majority misconceives the nature of the error we are called upon to consider. The error here, if there be any, lies not in the fact that the judgment decrees a double recovery but in the fact that it *may* do so. Inasmuch as 1949 crop damage was to be determined by answers to other issues it was error for the court to word or phrase issues 14 and 16 so that the jury's answers to those issues *could* award the same damage again. Our first task then is to examine issues 14 and 16 to see if, fairly interpreted, they permitted answers that would include such damage. Unless they did, there was no error in the charge and we need pursue the inquiry no further. We first consider issue No. 16 dealing with Combs' damages.

The holding of the majority that the jury's answer of $13,600.00 to issue No. 16 includes 1949 crop damage treats issues Nos. 15 and 16 as though they inquire whether Combs has lost anything under his lease to Harrison and the amount of the loss. If such was in fact the nature of the inquiry I would agree

that the jury could have included 1949 crop damage in their answer to issue No. 16. But such is not the nature of the inquiry. Issues Nos. 15 and 16 have nothing to do with the lease to Harrison or the losses already sustained or thereafter to be sustained by Combs under that lease. By issue No. 15 the jury is asked whether Combs' land will rent for less than it would have rented for but for petitioner's wrongs, and by issue No. 16, how much less. It is well established by the decisions of this Court that a landowner whose land is injured and whose crop thereon is destroyed by the negligent acts of another may recover both the diminished value of the land and the value of the crop. Gulf, C. & S. F. Ry. Co. v. Helsley, 62 Texas 593, 596; International & G. N. Ry. Co. v. Pape, 73 Texas 501, 11 S.W. 526; City of Amarillo v. Ware, 120 Texas 456, 40 S.W. 2d 57; Lone Star Gas Co. v. Hutton, Tex. Com. App., 58 S.W. 2d 19. The majority opinion fails utterly to assign any reason why a landowner may recover the diminished market value of his land and the value of a lost crop but may not recover the diminished rental value of his land and the value of a lost crop. I can think of no sound basis for saying that the latter involves a double recovery while the former does not. I cannot agree that issue No. 16 was so worded as to lead the jury to include 1949 crop damage in their answer thereto. There being no such error we should not pursue the inquiry further.

With respect to the respondent Harrison it is held that 1949 crop damage is included in the trial court's judgment decreeing to him a recovery of $49,160.00, found by the jury in answer to special issue No. 14 to be the amount by which "the value of the use" of his "leasehold interest" in the land was reduced. I agree that the wording of issue No. 14 was such as to *authorize* the jury to include 1949 crop damage in their answer thereto. But the fact that the issue and the charge may have been erroneous to this extent does not require the conclusion that the jury did award crop damage in its answer to the issue or compel the subtraction of $28,568.80 from Harrison's recovery.

It is my opinion that as to Harrison's recovery of damages the judgment presents a situation to which the provisions of Rule 503, Texas Rules of Civil Procedure, are applicable. It is there directed that we shall not reverse a judgment for errors of law committed in the course of the trial unless we are of the opinion that the error complained of "was reasonably cal-

culated to cause and probably did cause the rendition of an improper judgment in the case."

For the purpose of this discussion we may assume that it was error to so word issue No. 16 as to permit the jury to include 1949 crop damage in their answer thereto when that specific item of damage was being determined separately by answers to other issues. Since the issue was so worded as to permit the jury to include 1949 crop damage in their answer thereto, we may assume also that the error was "reasonably calculated" to cause the entry of a judgment awarding to Harrison double damages—an improper judgment. But the provisions of the rule direct that we must not stop our analysis at this point and order a reversal on what we thus far have concluded. We must go further before ordering a reversal and find from an examination of the whole record (see Cole v. Waite, 151 Texas 175, 246 S.W. 2d 849; City of Galveston v. Hill, 151 Texas 139, 246 S.W. 2d 860; Dallas Ry. & Term. Co. v. Bailey, 151 Texas 359, 250 S.W. 2d 379) that the error "probably did cause" the rendition of a judgment decreeing a double recovery. Moreover, the burden is on petitioners to satisfy us that the jury's answer to issue No. 14 probably included 1949 crop damage. Texas P. & L. Co. v. Hering, 148 Texas 350, 224 S. W. 2d 191; City of Galveston v. Hill, supra.

The only support the majority offers for its conclusion that the jury's answer to issue No. 14 *probably did* include 1949 crop damage is that the issue was so worded that it could have been included. The majority then says that "by the wording of the issue the jury were affirmatively instructed to include all damage done in their answers sought" and concludes that the answer to issue No. 14 therefore "must of necessity" include 1949 crop damage. Aside from the fact that I am unable by diligent search to find in the court's charge any such affirmative instruction as that mentioned by the majority, the jury certainly was not instructed to include all damages done to Harrison in its answer sought to issue No. 14. By the giving of separate issues dealing with 1949 crop damage the jury was at least impliedly instructed to segregate this item of damage. I do not regard the fact that the issue was so worded that crop damage could have been included as sufficient proof that it probably was included.

My own examination of the record reflects the following pertinent facts: By the petition upon which he went to trial Harrison pleaded specially "that by reason of the loss of 5,076.4

barrels of rice and the damage to 2,200 barrels of rice" in 1949 he was damaged in the sum of $34,179.31. By separate paragraph he pleaded that the value of his leasehold estate which had a fair and reasonable value of not less than $75,000.00 for rice farming purposes had been totally destroyed to his damage in the sum of $75,000.00 and alternatively that he had been deprived of his right to the use, possession and enjoyment of his leasehold estate to his damage in the sum of $75,000.00. In his prayer he sought a recovery of $109,179.31, the sum of the two items. So it appears that by the pleading the jury was advised that the two items of damages sought were separate items, neither of which was included in the other. In answer to a question as to his opinion of the fair and reasonable value of his leasehold estate prior to the time the damage occurred *"exclusive of the rice crop you had in 1949"* Harrison testified that it was conservatively at least $75,000.00 and that its value after the damage was $4,000.00. Thus by the evidence the jury was advised of a loss in value of the leasehold estate of $71,000.00 *exclusive* of the 1949 crop damage. In addition there was detailed testimony with reference to the damage and loss in the 1949 crop. The issues submitted did not permit the jury to make a finding of the total damage suffered by Harrison because of the loss of his 1949 crop. In answer to issues 10, 11 and 12 the jury found that but for the injury thereto the land would have made 21 barrels of rice per acre, that the cost of raising, harvesting and selling the rice was $1.25 per barrel and that the rice would have sold for $10.00 per barrel. Based upon these answers and upon stipulations of the parties of the number of acres planted to rice, the number of barrels actually harvested and sold, and the amount received therefor the court awarded Harrison judgment for the sum of $28,568.80, this sum representing Harrison's 41/60th interest in the total loss. It hardly seems likely that the jury included this item, arrived at only by the judge by a somewhat involved arithmetical process, in its answer to issue No. 14.

Consideration of the record leads to these further conclusions: If $28,568.80 of the $49,160.00 item is allocated to crop damage according to the holding of the majority, only $20,591.20 is left to be allocated to damage to the remainder of the eleven-year leasehold estate although all the pleadings and evidence were to the effect that the damage to the remainder of the leasehold estate was much greater than the 1949 crop damage. To allocate $28,568.80 to 1949 crop damage would also result in an award to the tenant as damages to his leasehold estate of only

one and one-half times as much as was awarded to the landlord for the diminished rental value of the land, although the award to the tenant for 1949 crop damage was more than ten times as great as the crop damage awarded to the landlord, and although his interest in the crops to be grown in the ensuing ten year period was ten times as great as the interest of the landlord.

To my mind the foregoing facts shown by the record demonstrate almost conclusively that the jury did *not* include 1949 crop damage in its answer to issue No. 14. It follows that we should not say that it probably did include it. It then follows that we should not say that the error in the wording of issue No. 14 probably resulted in the rendition of an improper judgment.

It is no answer to say that the provisions of Rule 503 do not apply when we reform and affirm a trial court's judgment. The effect of our judgment is to reverse an important part of the judgment of the courts below because of an error which it is not shown probably resulted in an improper judgment. This is the result the rule was intended to prevent. In my opinion the judgments of the trial court and Court of Civil Appeals should be affirmed.

Mr. Associate Justice Smedley joins in this opinion.

Opinion delivered October 22, 1952.

Rehearing overruled December 3, 1952.