Verna Katheryn SARTAIN, Individually and as Next Friend of Her Minor Children, Kathy Sartain and Janie Sartain, Appellant,

v.

SOUTHERN NATIONAL LIFE INSURANCE COMPANY, Appellee.

No. 11016.

Court of Civil Appeals of Texas.

Austin.

Jan. 9, 1962.

Rehearing Denied Jan. 30, 1963.

Runge, Marschall & Hall, San Angelo, Graves, Dougherty, Gee & Hearon, William L. Garwood, Jr., Austin, for appellant.

Kerr, Gayer, Ray & Lyons, San Angelo, for appellee.

HUGHES, Justice.

Frank W. Sartain, the husband of Verna Katheryn Sartain and the father of Kathy and Janie Sartain, was killed in an automobile collision on October 18, 1958, on U. S. Highway 158, about twenty-six miles east of Midland, Texas. He was driving alone in an eastbound automobile when it collided head-on with a westbound automobile operated by Ollie L. Gray, in which car Billy Gene Bruce was a passenger. Mr. Bruce also died of the injuries sustained in the collision.

This appeal, as it reaches us, is from a judgment rendered, notwithstanding the jury verdict, in favor of Southern National Life Insurance Company, by which such company was dismissed with its costs.

Mrs. Sartain had filed pleadings for herself and children alleging that Ollie L. Gray

was guilty of negligence proximately causing the collision, and that at such time he was the agent and employee of the Southern National Life Insurance Company and was then engaged in the business of the company. She sought judgment for damages against Gray and the company.

The case was tried to a jury which found Gray guilty of eight negligent acts proximately causing the collision. Mr. Sartain was exonerated of allegations that he was contributorily negligent.

The jury also found that at the relevant time Ollie L. Gray was an employee of the appellee insurance company and was in the course of his employment; that Billie Gene Bruce was a "vice principal" of appellee, was in the course of his employment, and had a right to control the operation of the automobile in which he and Gray were riding.

■ The validity of the negligence and related findings are not here in issue. The only jury findings which are questioned are those bearing upon the relationship between appellee, Bruce and Gray. If there is any evidence to sustain those findings, then the Trial Court erred in disregarding them in the rendition of judgment. Lynch **v.** Ricketts, 158 Tex. 487, 314 S.W.2d 273.

■ The question of no evidence requires us to give credit to all evidence supporting such findings and to indulge every legitimate conclusion in their favor. Pickens v. Harrison, 151 Tex. 562, 252 S.W.2d 575. This, we do.

Appellee is a life insurance company with its home offices in San Antonio, Texas.

Ollie L. Gray was appellee's insurance soliciting salesman for "San Angelo and vicinity."

Gray and appellee entered into a written contract of employment on October 9, 1958, nine days prior to the collision in suit.

Appellant has summarized or quoted the portions of this agreement which she deems

pertinent and since appellee does not object thereto we quote from appellant's brief and adopt the following statement:

"This agreement is in the form of a letter to Mr. Gray from Southern National signed by its President, and bearing a printed endorsement at the end signed by Mr. Gray accepting the appointment. Gray's signature is witnessed by 'Bill G. Bruce, District Manager.'

"Gray's appointment was as 'Agent' of the Southern National Life Insurance Company' for the territory of San Angelo and vicinity, 'but without exclusive rights in such territory.' Section 1 states that Gray's duties shall be:

" '(a) To solicit and procure applications for life insurance, annuties, and accident and health insurance in the Southern National Life Insurance Company.

" '(b) To deliver policies and make collections and remittances subject to the rules, regulations or instructions of the Company and to perform such other duties as may be requested by the Company.'

"Section 2 is headed 'Responsibility' and in it Gray agrees to account to the company 'for all policies, premiums and other receipts, moneys and also all other papers and property received by you from the Company, its policyholders or representatives.' Gray also agrees to treat all collections as 'trust funds,' to furnish a surety bond at the company's request and, in subparagraph (b):

" 'To represent the Company in accordance with the laws in force in your territory and with all present and future rulings, regulations and instructions of the company.'

"Section 3 is headed 'Limit of Authority,' states that Gray's 'authority

shall extend no further than stated herein,' and lists certain specific acts which Gray is not authorized to perform on behalf of the company.

"Section 4, headed 'Compensation,' states that this 'shall consist of the following commissions and fees upon premiums paid to the company in cash' and sets forth a table of first-year and renewal commissions upon various plans of insurance.

"Section 5 provides that death shall terminate the agreement, and that it may also be terminated 'at any time by either you or the company upon ten days' written notice' or 'by the company immediately for cause.' Termination and forfeiture of accrued commissions are also provided for if Gray refuses to turn over to the company any of its property, or in the case of similar misdeeds.

"The Company agrees in Section 8 to furnish Gray 'with a reasonable amount of printed matter such as it issues for the general use of its representatives' and requires that Gray not use or circulate 'any written or printed matter pertaining to the Company or its business without first obtaining written approval therefor from an officer of the Company.' Gray is also prohibited from instituting legal proceedings against any applicant or policyholder 'or against any other party for any cause growing out of business transaction under this contract' without the Company's prior approval. Gray is required to forward immediately to the home office 'all applications and medical examination reports obtained under the authority of this contract.'

"Gray also agrees (Section 16) that 'all books of accounts, documents, vouchers, letters and all other property and papers connected with the business transacted under this agreement shall be the property of the Company, and that they shall be open to inspection at all times by its officers, or their authorized representatives and shall, at the termination of this agreement, be turned over to the Company or its duly authorized representative upon demand.'

"Section 17 provides that 'No assignment of this agreement of the commissions accruing under it or any interest therein shall be effective except with the prior consent of the Company.'

"In Gray's acceptance of the appointment, he agrees 'faithfully to perform the duties incident to the position, in accordance with the terms and provisions of the foregoing, and in conformity to the general rules of the Company and such instructions as I may receive from the officers thereof.'"

Billie Gene Bruce also had a contract, dated October 6, 1958, with appellee similar in nature to the Gray contract. In addition Bruce had a contract with appellee designated "District Manager's Contract." This contract, also dated October 6, 1958, has been described by appellant in her brief to which appellee makes no objection. We quote and adopt the following statement from appellant's brief:

"This contract supplements Bruce's Agent's Contract, and appoints Bruce as 'a District Manager of Southern National Life Insurance Company for the San Angelo District of Texas, but without exclusive rights in such District.' The San Angelo district is stated to include 'San Angelo and vicinity.' The first portion, headed 'Duties and Responsibilities,' provides:

" 'This contract is given to you on your assurance that you will, for the benefit of Southern National Life Insurance Company, perform the following duties and assume the following responsibilities, to-wit:

" '(a) To faithfully and industriously comply with the terms and conditions set forth in your appointment as agent

of Southern National Life Insurance Company, and to perform the duties incident thereto, except as may be specifically modified or enlarged herein.

" '(b) To hire agents to work in your district, and to properly train, supervise and work with agents of the Company working under you in your district, whether hired by you or assigned to you by the Company. All such agents supervised by you shall be considered a part of the San Angelo district agency. All agents hired by you must first be approved by the Company.

" '(c) To see that the agents of your district agency under your supervision and for whom you are responsible perform the duties incident to their position and comply with the terms and provisions of their agent's contracts.

" '(d) To comply with all rules and regulations which from time to time may be promulgated by the Company as to the management and supervision of your District Agency.'

"The next section, headed 'Compensation,' states that Bruce 'will be compensated for your personal production under the provisions of your Agent's Contract' and that in addition he will be entitled to receive, both on his personal production and also on business written by agents working in his district, certain 'overriding' commissions, as set out in a table included in the printed form.

"The contract contains termination provisions identical to those in the Agent's Contract, but provides in addition that the company may terminate the Manager's Contract, at its discretion, without terminating the Agent's Contract.

"The contract grants Bruce an 'expense allowance' for the first four weeks after his October 6th appointment of $25 to $100 weekly, depending upon his 'production.' It is pro-

vided that 'This expense allowance is to be used by you to pay expenses incurred by you, such as rent, telephone, stenographic or clerical help. You are not to make any contracts or create any obligations in the name of Southern National Life Insurance Company, and the Company will not be liable for any of your expenses or of your agency beyond the expense allowance herein provided.' After the first four weeks, the expense allowance is to be continued only after specific approval and for so long as Bruce 'shall reasonably maintain' the production of his agency, as determined by the Executive Committee of the Company.

"This contract also contains a provision against its assignment, or the assignment of the commissions accruing under it, without prior written consent of the company.

"Bruce's District Manager's contract is also signed by Fred H. Brown, President of Southern National Life Insurance Company, is approved by the Chairman of the Executive Committee, and signed by Bruce."

Ollie L. Gray testified that he was hired by Bruce to go to work for appellee about six weeks before the accident. During this time he sold some insurance for it and earned about six hundred dollars. Mr. Gray considered Bruce his "boss" who had the right to fire him.

Mr. Gray regularly used his car in selling insurance and testified that he could not make a living selling insurance without the use of a car.

On the day of the accident Mr. Gray had been delivering policies and collecting premiums. He met Mr. Bruce about 2:00 p. m. in a friend's office in San Angelo. About 5:00 p. m. they left San Angelo for Midland in Gray's car, and Gray was driving. Before leaving, the car was filled with gasoline, Mr. Bruce paying for it by use of a credit card. The purpose of the

trip to Midland was to see prospective insurance purchasers, whose identities and addresses were known only to Bruce, and to further the training of Gray by Bruce. Both men carried insurance papers and material furnished by appellee. The trip was for business reasons alone and was solely for the purpose of furthering appellee's insurance business.

Gray and Bruce agreed to evenly divide any commissions they might earn on this trip; also to evenly share losses.[1]

Mr. Bruce did not complain of the manner in which Gray drove the car. Mr. Gray stated that he would have yielded to reasonable suggestions by Mr. Bruce as to operation of the car.

Considering these facts, conclusive or evidentiary, can it be said that they, viewed most favorably to appellant, support the jury findings making appellee liable to appellant under the doctrine of "respondeat superior?" Appellee, relying primarily upon American National Insurance Co. v. Denke, 128 Tex. 229, 95 S.W.2d 370, 107 A.L.R. 409, and Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, would have us say "no".

The opinion in Denke was by the Commission of Appeals, and was adopted by the Supreme Court. It involved the liability of an insurance company for the negligent operation of an automobile by one of its insurance salesmen, named Saunders, who also collected premiums on old policies. The accident occurred in Galveston where Saunders worked for the company. While enroute, in his wife's car, from his home to visit prospects in another agent's territory whom Saunders was required by the company to assist, he negligently collided with another vehicle. The company did not furnish Saunders with a car, nor require him to use a car. The evidence showed that the company had knowledge that Saunders was using his wife's car in his work as agent.

Saunders had a written contract with the company. It required him to solicit new insurance, collect premiums and among other duties "[t]o obey the orders and to carry out the instructions of the company, and to use my best efforts to further its success." As compensation, Saunders was paid 15% of his collections and certain commissions on new insurance. The Court held that Saunders was not a servant of the company. We quote from that opinion:

"Without undertaking to comment upon the various terms of the written contract between the insurance company and Saunders, we think we may safely and confidently say that it is undoubtedly one of agency. Eliminating all matters of definition and distinction, it is obvious we think that Saunders was in common and everyday parlance an 'insurance agent,' and, as such, plaintiff in error was his principal. That he was not a 'servant,' within the usual significance of that term, seems to be obvious. See American Savings Life Insurance Company v. Riplinger, 249 Ky. 8, 60 S.W. (2d) 115. Therefore, in considering the liability of plaintiff in error for the tortious acts of Saunders, we must apply the principle governing in such matters where the relationship or principal and agent is involved, and as particularly applicable in cases of this special class.

"In Section 250 of the Restatement of Law of Agency by the American Law Institute, it is said:

" 'Except as stated in section 251, a principal is not liable for physical harm caused by the negligent physical conduct of an agent, who is not a servant, during the performance of the principal's business unless the act was done in the manner directed or authorized by the principal or the result was one intended or authorized by the principal.

---

1. The jury found that Gray and Bruce were engaged in a joint enterprise.

" 'Comment:

" '(a) A principal employing another to achieve a result but not controlling nor having the right to control the details of his physical movements is not responsible for incidental negligence while such person is conducting the authorized transaction. Thus, the principal is not liable for the negligent physical conduct of an attorney, a broker, a factor, or a rental agent, as such. In their movements and their control of physical forces, they are in the relation of independent contractors to the principal. It is only when to the relationship of principal and agent there is added that right to control physical details as to the manner of performance which is characteristic of the relationship of master and servant, that the person in whose service the act is done becomes subject to liability for the physical conduct of the actor.

" '* * * [2] We are brought therefore, to the precise inquiry as to whether or not in this instance Saunders, in his capacity as agent, also occupied the further capacity of servant of the insurance company in the matter of operation of the automobile. It is settled that 'the test of one's liability for the act or omission of his alleged servant in his right and power to direct and control his imputed agent in the performance of the causal act or omission at the very instant of the act or neglect.' Putting the matter in a different way, it may be said that a master is liable for acts of his agent under the doctrine of respondeat superior only where the relationship of master and servant exists at the time and in respect to the very thing causing the inquiry and from which it arises.

" * * * In our opinion, while there are numerous provisions in the contract which indicate control over Saunders, yet we think the control evidenced by such provisions related primarily to the contractual features of his employment, and to the attainment of ultimate results, and not to 'physical details as to the manner of performance' of his movements while soliciting, collecting, attending meetings, etc. Falling short in this last particular, the control was not such as to create liability on the part of plaintiff in error for his negligent acts in the operation of his wife's automobile; although at the time he may have been engaged in the furtherance of the company's business."

Referring to Stockwell v. Morris, 46 Wyo. 1, 22 P.2d 189, the Court in Denke stated:

" * * * It reviews practically all American cases falling in this class. It demonstrates clearly how the doctrine here announced as applicable to salesmen and insurance agents has developed as a departure from the rigid rule applicable in cases of master and servant. The court notes the importance of a recognition of the distinction between an ordinary servant and an agent, such as was Saunders in this instance, and concisely puts the question for ultimate decision as indicated by the italicized portion of the following excerpt from the opinion:

" 'A servant is defined as a person employed to perform personal service for another in his affairs, and who, in respect to his physical movements in the performance of the service is subject to the other's control or right to control, while an agent is defined as a person who represents another in contractual negotiations or transactions akin thereto. The reason assigned for the importance of making the distinction is that an agent who is not at the same time acting as servant cannot ordinarily make his principal liable for incidental negligence in connection with the means incidentally employed to accomplish the work intrusted to his care. * * *

"After referring to certain cases which sought to give controlling effect to provisions of the contract which evidenced a right to control in contractual matters, as distinguished from control of the physical movements of the agent in the particular matter wherein the accident arose, the court said:

" 'In so far as these cases base the right of control on the fact that the employer had the right to direct the terms of the contract, they are opposed to the great weight of authority. If that test were correct, then there would be few, if any, cases involving the negligence by a salesman, in which the doctrine of liability of the master for the negligence of a servant would not be applicable. These cases treat the physical movements of the person employed as but a minor part or incident in the performance of the employment, when, as a matter of fact, it is the major factor so far as an automobile accident is concerned. The making of a contract, affected by an agent, would seem to be but the result which is sought. It is exactly during the time that the so-called minor part is performed when an accident with an automobile is apt to occur. It will not likely take place while the salesman is talking to a customer, trying to effect, or effecting, a sale. If accordingly, the right of control is the test in connection with the question before us, and the courts apparently agree that it is, then, it would seem, it ought to be directed to *that portion of the employment directly connected with the factor by reason of which liability is sought to be established.* It would not do, we think, to pursue the shadow, leaving the substance out of consideration.' (Italics ours.)

"After a review of numerous other cases the court reached the conclusion that 'the right of control of the physical movements—the automobile—is the decisive inquiry.' The court then con-cludes that in the absence of an express reservation in the contract of control in that regard, or a necessary implication of such right from all the provisions of the contract and the circumstances, there could be no liability on the part of the principal.

"As pointed out in the statement of the case, the contract in this instance gave plaintiff in error no control over the manner and means adopted by Saunders in the performance of his work, and left him free to choose any mode of travel which might seem to him best. He owned no automobile, and was furnished none by the company, and only at times used his wife's car for transportation. Most frequently he went on foot or by other means. Tested by the principles above announced, we are inescapably driven to the conclusion that there was no control over him by plaintiff in error in the matter of physical movements in the accomplishment of his work, and consequently plaintiff in error was not liable for his negligent acts in operation of the automobile."

The opinion in Burt v. Lochausen, supra, affirms the above stated legal principles.

We find no substantial dissimilarities between the contract in Denke and the contract between Gray and appellee in aspects found by the Court to preclude liability of the employer for negligence of the agent in operating an automobile. Neither the contract there nor the contract here mentions transportation or the means by which the agent is to move about in the performance of his duties. Not only was the contract in suit silent in this respect, but factually appellee did not furnish or pay for Gray's transportation.

■ We are not to be understood as holding that appellee did not contemplate the use of a car by Gray in the discharge of his duties. We know, and appellee knew, as a matter of common knowledge that the

only practical way in which an insurance salesman or collector can cover a district as large as "San Angelo and vicinity" which concededly extends more than a hundred miles to Midland, is by private automobile. This knowledge, however, is not the equivalent of actual authority, either express or implied. The fact that the parties knew that some conveyance was indispensable to Gray in covering his district and yet made no provision for it in their contract fortifies the conclusion that this was a matter left to the independent discretion and control of Gray. We therefore, hold that Gray was on his own in providing and paying for the transportation he required, and that there is no evidence that appellee had supervision over the method employed or the manner in which it was conducted. It follows that the claimed liability of appellee is non-existent, unless the finding that Mr. Bruce was a vice principal of appellee together with his presence in the automobile at the time of the collision alters the situation.

■ A vice principal, as defined in the Court's charge, is a servant, who, in addition to his authority to direct and supervise the work of those under him, has authority to hire and discharge a subordinate servant.

The work which Mr. Bruce was authorized and required to do under his contract with appellee as its district manager is hereinabove shown. As applicable here it relates to the training of Mr. Gray as an agent for the company and assisting him in the performance of his duties as an agent.

We believe that the omission here, as in the agent's contract, of any reference to transportation of the district manager in the performance of his duties as such, and the absence of other evidence in this regard, negatives any right of control by the company over his locomotion or the means by which it was accomplished.

We readily concede that the purpose of the trip was to further the business of appellee. It is immaterial, we believe, that the training of one of its agents was involved. The use of an automobile was not required in order to train an agent to sell insurance or to collect insurance premiums, although it may have been required in order to reach the place of activity.

Appellant has cited many authorities to us, both local and foreign, but he has cited no case by our Supreme Court which casts disparagement upon its decision in Denke. For this reason, we would accomplish nothing in reviewing those decisions, and we refrain from doing so. Since it is our opinion that the rules set out in Denke require affirmance of the judgment of the Trial Court, it is so ordered.

Affirmed.

PHILLIPS, J., not sitting.