## The Standard Insurance Company v. I. R. McKee.

No. A-1286. Decided November 5, 1947.
(205 S. W., 2d Series, 362.)

*Whitaker, Turpin, Kerr, Smith & Brooks,* of Midland, for petitioner.

*Scarborough, Yates & Scarborough,* of Abilene, for respondents.

MR. JUSTICE SMEDLEY delivered the opinion of the Court.

Holding that there was evidence to support the jury's finding that respondent, when injured, was not an independent contractor, the Court of Civil Appeals affirmed the trial court's judgment in respondent's favor for payments of $20.00 per week for 401 weeks under the Workmen's Compensation Law. 201 S. W. (2d) 627. The sole question presented here is as to the correctness of that ruling.

Respondent was employed by Branscum, superintendent of the Valley Osage Oil Company, petitioner's insured, to drill oil wells on its lease in Shackleford County. He drilled in order its wells Nos. 8, 9 and 10, and was injured while working on well No. 10. The agreement for his employment was partly written and partly oral, the written part being the following letter relating to well No. 8 written by respondent to the oil company and endorsed "accepted" by Branscum:

"This is to outline Mr. Branscum and my agreement for me to drill a well on your Alexander lease in Shackleford County, Texas.

"I am to drill a well on your lease to the depth of 900 feet, unless oil or gas is encountered at a lesser depth for the price of $2.25 per foot, and $40.00 per 8 hour tour for day work. I will furnish all water, slush pit, fuel, water and 8" and 7" casing, but you are to furnish the oil string and pay for any pipe that is left in the hole. I will carry Workmen's Compensation and Liability Insurance. Drilling is to start within 30 days from this date."

After the completion of well No. 8 Branscum telegraphed the respondent to begin drilling well No. 9, "same basis well Number Eight ." Respondent's undisputed testimony is that when well No. 9 was finished he was directed to proceed with well No. 10 on the basis of No. 8 and No. 9.

■ Since the letter and the directions to drill the second and third wells are brief and general in their terms, and do not undertake to define the relation between the parties or the right of control, it becomes necessary to look to the evidence as to the situation of the parties, the facts and circumstances touching the relation, and particularly the evidence as to the nature and extent of the control that was actually exercised over the performance of the work. Dave Lehr, Inc. v. Brown, 127 Texas 236, 91 S. W. (2d) 693; Blankenship v. Royal Indemnity Co., 128 Texas 26, 95 S. W. (2d) 366; Southern Underwriters v. Samanie, 137 Texas 531, 535-536, 155 S. W. (2d) 359; 27 Am. Jur., p. 488, Sec. 6; Note 20 A. L. R. pp. 684, 725.

There are no material contradictions in the testimony. Respondent, an experienced driller, owned his drilling rig and too's and for several years had been making contracts for the drilling of oil wells. He employed the helpers who worked with him on the three wel's, paid them and carried workmen's compensation. The helpers were never on the payroll of the Valley Osage Oil Company.

The method and manner of drilling and completing the wells were as fol'ows: The top of the pay lime was reached at about 880 feet. Thereupon Branscum ordered respondent to stop drilling. While the well was being drilled down to the lime the operations were under the control of McKee, who gave all orders and directions; and during that time respondent was an independent contractor. When the top of the lime was reached Branscum furnished the oil pipe and told respondent to run and set it. He directed that the pipe be cemented, which was done,

and the cement was allowed to set until Branscum directed that the plug be drilled out. After the plug was drilled out Branscum directed that the tubing be run in order to acidize the well, and when that process had been completed by another company the rods for pumping were run at Branscum's direction. Thereupon Branscum gave instructions that the well be pumped, telling them when to pump and how long. It was pumped from the rig for a few hours. Thereupon the well was put on the pump jack, connected with the oil company's power. That marked the end of respondent's services on the well and of the use of his rig and tools.

Well No. 10 was not fully completed while respondent was working on it. After the oil pipe in that well was first comented, respondent himself drilled the plug. It was found that the cement did not hold and the Halliburton Company cemented it again. That stood for about 48 hours, when Branscum told respondent to go out, pick up the tools, dress the bit, and get ready to drill the new plug. While dresing the bit respondent suffered the injury on account of which this suit was filed. His clothing was ignited from fire in the forge.

The controversy is about the nature of the relation between the oil company and respondent that existed after well No. 10 had been drilled to the top of the lime. Petitioner contends that there was one contract for the completion of the well, that respondent began his work on it as an independent contractor, and that there is no testimony from which it can reasonably be inferred that at the time of his injury respondent had been transformed from an admitted independent contractor into an employee. It argues that the control exercised by Branscum, the oil company's superintendent, was of a nature necessary to secure the performance of the contract and to accomplish the results contemplated by the parties, and that the control dealt with what should be done under the contract and not with the details of how respondent should perform the work. On the other hand, respondent's contention is that after the well was drilled to the pay lime Branscum, the oil company's superintendent, exercised authoritative control in the direction of the manner, means and details of the work performed for the completion of the well.

■ The record contains evidence of elements bearing upon the relation between respondent and the oil company from which it could reasonably be inferred that respondent continued to be an independent contractor during the time when the well was being finished. We believe, however, that the solution

of the question presented in this case is correctly reached by the application of the test of right of control, which, according to our decisions and most of the modern cases, is used as the supreme test. Ochoa v. Winerich Motor Sales Co., 127 Texas 542, 94 S. W. (2d) 416; Blankenship v. Royal Indemnity Co., 128 Texas 26, 95 S. W. (2d) 366; Southern Underwriters v. Samanie, 137 Texas 531, 155 S. W. (2d) 359; Industrial Indemnity Exchange v. Southard, 138 Texas 531, 160 S. W. (2d) 905; Dennis v. Texas Employers' Ins. Ass'n., 116 S. W. (2d) 492; Khoury v. Edison Electric Illuminating Co., 265 Mass. 236, 164 N. E. 77, 60 A. L. R. 1159; Northwestern Mutual Life Ins. Co. v. Tone, 125 Conn. 183, 4 Atl. (2d) 640, 121 A. L. R. 993; 27 Am. Jur., p. 486, Sec. 6.

■ Respondent McKee, Branscum, superintendent of the oil company, and three drillers who were employed by respondent and worked on the lease testified as to the orders given and the work done after the wells reached the lime. The testimony of the three drillers is in most respects substantially the same. It is that while respondent had supervision and direction over what they did until the lime was reached, thereafter Branscum told them what to do and when to do it. Branscum instructed them when and where to set the pipe, when to drill the plug, when to tube the well, and when to put it on the pump, giving directions and orders for the several operations that were necessary to bring the well into production. When the time came to cement the pipe, Branscum told them how much cement to put in the mixture and how much water "to load the hole with," and when to run the tools in. The drillers testified that Branscum told them how to do some of the work. For example, one of them, Hatfield, testified, with reference to well No. 9, that in performing the tasks for the completion of the well, including acidizing it and putting it on the pump, Branscum gave him "orders on how to do that." On cross examination, however, Hatfield testified that Branscum told him to drill the plug but not how to drill it, and to bail the hole but now how to bail it, that he knew how to do those things.

Macon, another driller, testified that when he was drilling well No. 10 Branscum told him where to stop to get ready to run the 5" pipe, and that three or four times while he was running the pipe Branscum came to him and said that the pipe was not tight enough and that he should make it tighter. Grounds, another driller, who worked on well No. 9, testified that when he and other workmen were setting the oil string in the well

Branscum picked out the nipples to finish out the pipe to the level of the ground "like he wanted it," had them mix the cement and showed them "how to put the cement in, and what all to do to that."

Speaking generally as to the giving of orders by Branscum, Hatfield testified that when he was engaged in the work of completing the well after it reached the lime, Branscum was present or would give orders what to do, and that it was the custom in finishing a well never to do anything without orders from someone representing the company. Macon testified that respondent gave no further orders on well No. 9 after the contract depth was reached (evidently meaning the depth of 880 feet) and that Branscum commenced giving orders at that time.

Respondent's testimony, like that of the drillers, shows that the various steps taken for finishing the well after it reached the producing zone were taken when and where Branscum ordered them to be taken. He testified that he worked during the period of time when the well was being put on production, that is on the day work, and that he issued no orders on how the day work should be done. Respondent testified further, with reference to well No. 10, that he suggested to Branscum to procure the Halliburton Company to cement the pipe, but Branscum said "No, we will cement it," and Branscum told him how to mix the cement and pour it in the hole; that when Branscum thought the cement had set long enough he told him to go out and drill the plug, which he did. It was found that the cement had not held and Branscum called in the Halliburton Company to cement the pipe again. After about 48 hours Branscum told respondent to go out, take up the tools, bail out the hole and get ready to redrill the plug. It was while dressing the bit pursuant to these orders from Branscum that respondent was injured.

It is shown by the testimony that respondent sometimes worked as a driller on the wells. He ran a few tours on well No. 10, and he worked on the day work. He helped cement the pipe in that well and drilled the first plug, and was dressing the bit to drill the second plug when he was injured.

Branscum's testimony differs little from that of respondent. It shows that he was present and directing what should be done and when in the process of finishing well No. 10, and that he helped in some of the work. According to his testimony on cross examination, he gave orders as to how certain parts of the

work should be done. He testified that he told respondent and his men to pull the tubing out and put it back and he determined how that should be done; that he determined when the cement should go in and told the men how much cement should be mixed to make the plug and how to put it in the hole; and that he gave instructions when to drill the plug, how far to go into the pay zone, and when to go in the hole and when to come out.

It is true that Branscum did not tell respondent and the others working on the well how to operate the drilling rig or how to bail the hole. They knew how to do those things. But the testimony which has been discussed indicates that Branscum had control over the finishing of the well to the extent of giving all orders for the taking of each step, when to begin and where, how far to go and when to stop and how long to wait, and sometimes how to perform the work. This testimony, in our opinion, at least tends to prove that the employer had, after the pay lime was reached, a right of control that was authoritative rather than merely supervisory, and that it related not to the ultimate results alone, but also the means and manner of performing the work. We agree, therefore, with the conc'usion of the Court of Civil Appeals that the evidence "is sufficient to raise a question of facts as to whether or not McKee was an employee of the oil company when he was burned." Blankenship v. Royal Indemnity Co., 128 Texas 26, 95 S. W. (2d) 366; Southern Underwriters v. Samanie, 137 Texas 531, 155 S. W. (2d) 359.

The judgment rendered on the jury's finding that respondent was not an independent contractor when he was injured does not mean, as petitioner argues, that the contract for drilling the well terminated when the day work stage of operations began after the well had been drilled to the lime. Both the letter and the oral testimony prove that respondent was employed to drill and finish the well. The effect of the jury's finding is that the contract as evidenced by the letter and the oral testimony made respondent an independent contractor as to one part of the work under the contract and an employee as to the other part. One may entrust work to an independent contractor and retain such control over the doing of a part of the work as to create the relation of master and servant in so far as that part of the work is concerned. Dublin v. Taylor, Bastrop, etc. Ry. Co., 92 Texas 535, 50 S. W. 120; Khoury v. Edison Electric Illuminating Co., 265 Mass. 236, 164 N. E. 77, 60 A. L. R. 1159; Vert v. Metropolitan Life Ins. Co., 342 Mo. 629, 117 S. W. (2d) 252, 116 A. L. R. 1381; American Savings Life Ins. Co. v. Rip-

linger, 249 Ky. 8, 60 S. W. (2d) 115; Restatement of the Law of Torts, Vol. 2, pp,. 1120-1121, Sec. 414.

The judgments of the Court of Civil Appeals and district court are affirmed.

Opinion delivered November 5, 1947.

No motion for rehearing filed.