NEWSPAPERS, INC., Appellant,

v.

Gerald Witt LOVE et al., Appellees.

No. 11038.

Court of Civil Appeals of Texas.

Austin.

April 3, 1963.

Rehearing Denied April 24, 1963.

Gay & Meyers, Austin, for appellant.

Byrd, Davis & Eisenberg, Austin, for appellee.

HUGHES, Justice.

Gerald Witt Love and wife, Edna Patsy Love, residents of Corpus Christi, Texas, sued for themselves and Mr. Love sued as next friend for his daughters Patsy Dolores Love, age 8 years, Connie Gail Love, age nine months, his son, Jerry Dan Love, age 5, and also in behalf of his wife to recover damages for personal injuries sustained by himself and by the other named members of his family and for damages for the death of his son, Dan Allen Love, age 6 years, sustained as a result of a collision between a pickup truck being driven by Mr. Love and a Buick passenger car being driven by Otis Franklin. The collision occurred about 5:45 a. m., April 11, 1959, in the 800 block of the Bastrop Highway within the city limits of Austin, Texas.

Named as defendants in the suit were Otis Franklin, Curren Eugene Cargile and Newspapers, Inc. Mr. Cargile was sought to be held liable on the ground that his negligent operation of a jeep was a proximate cause of the collision between the Love and Franklin cars. Newspapers, Inc. was alleged to be the employer of Cargile, and its liability is sought to be established under the doctrine of respondeat superior.

Trial was to a jury. Verdict and judgment on the verdict was in favor of appellees and against all defendants. Newspapers, Inc., only, appeals.

Appellant's first and second Points are that the Court erred in holding that there

was any evidence to support a finding that Cargile was its agent or, conversely, that there was any evidence to support a finding that Cargile was not an independent contractor.

The following issues were submitted to and answered by the jury as follows:

"SPECIAL ISSUE NO. 1:

"At the time and on the occasion in question, do you find from a preponderance of the evidence that the relationship between C. E. Cargile and Newspapers, Inc., was such that Newspapers, Inc., retained or exercised the power to control, not merely the end sought to be accomplished, but also the means and details of its accomplishment, not merely what should be done, but how and when it shall be done?

"Answer this special issue 'Yes' or 'No.'

"Answer: Yes

"SPECIAL ISSUE NO. 2:

"At the time and on the occasion in question, do you find from a preponderance of the evidence that C. E. Cargile was not an independent contractor within the meaning of the following definition?

"Answer this special issue 'He was not an independent contractor' or 'He was an independent contractor.'

"Answer: He was not an independent contractor.

"You are instructed that the term 'independent contractor,' as used in the foregoing special issue, means a person who undertakes to do work for another person, using his own means and methods, without submitting himself to the control of such other person in the details of such work, except as to the result of the work."

The rule to be applied in determining these points is that " '[i]f, discarding all adverse evidence and giving credit to all evidence favorable to the plaintiff and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff'—then there was evidence to support their verdict." Pickens v. Harrison, 151 Tex. 562, 252 S.W.2d 575.

Newspapers, Inc. publishes the Austin American and Austin Statesman newspapers in Austin, Texas. Mr. Cargile has for many years personally distributed these papers to purchasers living in a section of southeast Austin. He was so engaged at the time of the collision in suit. He had a written contract with Newspapers, Inc. at such time which designated the parties as "Publisher" and "Independent Contractor," respectively. It provided for sale by the publisher of its papers and purchase by Cargile of such papers as he might require for "resale and delivery" in a prescribed area. Mr. Cargile was obligated to "exercise his best efforts to promote and establish circulation of such newspapers within such territory." Payment for papers purchased was to be made on or before the tenth of the following month, "such payment shall be made on the basis of the rate agreement in effect between the Publisher and the Independent Contractor during the month for which such payment is made at" rates specified. In addition, we quote these provisions of the contract:

"Publisher will act as agent for Independent Contractor in receiving payments tendered to it for paid-in-advance subscriptions for newspapers to be delivered within the territory covered by this agreement. Publisher will remit such payments to Independent Contractor on a monthly pro-rata until each paid-in-advance subscription expires.

"3. Independent Contractor will furnish to the Publisher at any time, upon request, a full and complete written list

of names and addresses of all persons, firms and corporations to whom newspapers purchased under this agreement are delivered.

"4. Independent Contractor will provide, at his own expense, such transportation and assistance as he may need to perform his agreements hereunder. Independent contractor shall have the exclusive right, power and authority to manage and control his employees, and to direct the details of the work performed by them. Publisher shall not have any right, power or authority to manage or control the details of the work to be done by the Independent Contractor or his employees.

"Publisher shall be interested only in the satisfactory results to be accomplished by the Independent Contractor under this agreement, and shall have no control over the manner, means and methods by which such results are accomplished.

"5. This is a personal contract and neither party hereto may alter, sell, transfer, pledge or assign same without first obtaining written consent of the other party. No verbal agreement shall alter the terms of this contract.

"6. This agreement may be terminated by either party hereto, by giving ten days written notice to the other party, of his desire to terminate this agreement."

The evidence is undisputed that Mr. Cargile was not paid a salary by appellant. His compensation came from selling papers for more than their cost. No monies for income taxes were withheld by appellant on his account. Appellant carried no Workmen's Compensation Insurance for the benefit of Mr. Cargile and no contributions for unemployment insurance were made by appellant in his behalf.

Mr. Cargile owned the jeep used by him in delivering papers, and he paid all of its operating expenses.

Mr. P. F. Fincher, General Circulation Manager for appellant, and Mr. Phil Granath, City Circulation Manager, both testified that they exercised over Mr. Cargile no control beyond the terms of the contract with him.

There are many details, however, reflected by the record, not specifically mentioned in the contract, which relate to the manner in which appellant supervised and controlled its district managers. Before reciting the evidence as to these matters it is proper, we believe, to determine the effect of the contract between appellant and Mr. Cargile and the admissibility of evidence of other persons who held, at one time, contracts with appellant similar to the one under which Mr. Cargile worked, as to actual control exercised by appellant of the detailed manner in which they performed the services covered by the contract. These matters are presented by appellant's Points 3–6, inclusive.

The contract cannot be given conclusive effect, Humble Oil and Refining Co v. Martin, 148 Tex. 175, 222 S.W.2d 995 from which we quote the language of Associate Justice Garwood who wrote for the Court:

"We think the Court of Civil Appeals properly held Humble responsible for the operation of the station, which admittedly it owned, as it did also the principal products there sold by Schneider under the so-called 'Commission Agency Agreement' between him and Humble which was in evidence. The facts that neither Humble, Schneider nor the station employees considered Humble as an employer or master; that the employees were paid and directed by Schneider individually as their 'boss', and that a provision of the agreement expressly repudiates any authority of Humble over the employees, are not conclusive against the master-servant relationship, since there is other evidence bearing on the right or power of Humble to control the de-

tails of the station work as regards Schneider himself and therefore as to employees which it was expressly contemplated that he would hire. The question is ordinarily one of fact, and where there are items of evidence indicating a master-servant relationship, contrary items such as those above mentioned cannot be given conclusive effect."

To the same effect is Gulf Refining Co. v. Rogers, 57 S.W.2d 183, Waco Civil Appeals, writ dismissed, opinion by Justice Alexander, from which we quote:

"Even though the contract as originally entered into nominally created the relationship of employer and independent contractor, yet if such contract was a subterfuge, or if the employer thereafter assumed and actually exercised control over the means and methods by which the work was to be performed, the relation of master and servant existed between it and Russell and his employees, and the mere fact that the contract as written was so drawn for the purpose of creating the relation of independent contractor would not relieve the company of liability for the negligence of such servants."

Similarly in Elder v. Aetna Cas. & Surety Co., 149 Tex. 620, 236 S.W.2d 611, the Court, Associate Justice Brewster writing, stated:

"But petitioner contends that the insured used the contract as a mere cloak to exercise such control over him in the details of his work as a delivery boy as to create a master-servant relationship despite the contract. That this may occur is well recognized by our authorities and the same test applies, whether the claim lies within the field of common-law liability or arises out of the Workmen's Compensation Statutes, Vernon's Ann.Civ.St. art. 8306 et seq. The test is: Did the publishing company actually assume and exercise such detailed control over Elder's physical conduct in the performance of the labor provided for in the contract as to make him a servant, even though the contract did not so provide? Carter Publications Co., Inc. v. Davis, Tex.Civ.App., 68 S.W.2d 640, error refused; * * *."

We also quote from Halliburton v. Texas Indemnity Ins. Co., 147 Tex. 133, 213 S.W.2d 677, 680:

"The supreme test in determining whether one is an employee or an independent contractor, according to our decisions and most of the modern cases, is the test with respect to * * * control. * * * In deciding this question of right of control it is necessary to examine the evidence not only as to the terms of the contract, but also with reference to who actually exercised control of the details of the work * * *. This evidence is relevant as tending to prove what the contract really contemplated."

Mr. Phil Granath, appellant's City Circulation Manager, testified that the relationship between appellant and Mr. Cargile was the same as existed between appellant and appellees' witnesses F. V. Wheeless and Mayes Behrman when they were district managers for appellant, as shown by the following testimony of Mr. Granath:

"Q All the district managers are under the same contract, and that is the one that your lawyer introduced in evidence, is it,—is that not correct, sir?

"A Yes, sir.

"Q And Mr. Cargile is under that same contract?

"A Yes, sir, this particular one.

"Q And the only difference between Mr. Cargile and the other men is that he has a smaller route which—and it is rural; I mean, out in the edge of town, and it is small enough where he can do it himself, and he

"A does not need carriers; isn't that so?

"A He could use carriers.

"Q But I mean he is capable of doing that, a one-man job?

"A Yes, sir.

"Q Other than that distinction, there is no difference in their work for the paper, is there, sir?

"A No, sir.

"Q And the business relationship between the Newspaper and the other district managers, like Mr. Behrman, Mr. F. V. Wheeless, is the same as the business relationship between the Newspaper and Mr. Cargile, and was

"A Yes, sir.

"Q —back before this collision, was it not?

"A Yes, sir.

"Q That is true?

"A Yes, sir.

"Q The same—all of them operate under the same contract?

"A Yes sir."

When Mr. Cargile's deposition was taken prior to the time appellant was made a party to this suit he testified that "I am working for the paper." In such deposition he also testified:

"Q It is fair to say, is it not, that you do what the Management at the American-Statesman wants you to do?

"A That is right.

"Q And you do it because they want you to do it?

"A Sure.

"Q And you are obligated to follow their orders?

"A Right.

"Q And that would include doing what they want you to do when they want you to do it?

"A Yes.

\*    \*    \*    \*    \*    \*

"Q If you didn't get through on time and that occurred regularly—

"A They would do something about it.

"Q Who would do something about it, the Austin-American?

"A Yes, the Circulation Manager would do something about it.

"Q In other words, they control the manner that you work?

"A Yes.

"Q And they control when you come to work—

"A Right.

"Q —and when you pick up your papers?

"A Yes.

"Q And they control how, when you deliver your papers?

"A Right.

"Q And over what route you deliver them?

"A Yes, you have strictly a—

"Q In other words, it would be correct to say that your entire work and the method, the manner that you do it, when you do it and how you do it, is controlled by the Austin-American?

"A Right.

"Q The Management of the Austin-American?

"A Yes."

On the trial Mr. Cargile denied that he was an employee of appellant. He was also very reluctant to confirm the truth of his deposition testimony above quoted although his testimony is subject to this interpretation.

Beside Mr. Cargile, the only other witnesses who testified to the control or lack of control exercised by appellant over its district managers, excepting the former district managers, were Mr. Granath and Mr. Fincher. Unless the former managers are permitted to testify then appellees, strangers to the manner in which appellant conducted its business, would have to rely wholly upon the testimony of adverse witnesses, an unenviable position.

We believe that the testimony of the former district managers as to their relationship with appellant is admissible and that the following authorities support such ruling. Maryland Casualty Co. v. Real, 244 S.W.2d 865, San Antonio Civil Appeals, writ ref., n. r. e.; Standard Ins. Co. v. McKee, 146 Tex. 183, 205 S.W.2d 362; Federal Underwriters Exchange v. Turner, 140 S. W.2d 885, Beaumont Civil Appeals, writ ref.; Travelers Insurance Company v. Curtis, 223 F.2d 827, Fifth Circuit.

In these cases persons doing work under circumstances similar to the person directly involved testified to their relationship with the person for whom the work was being done in order that the status of the involved person as employee or independent contractor might be established.

In Standard Ins. Co. v. McKee, supra, Justice Smedley said that the solution of such question "is correctly reached by the application of the test of right of control * * * the supreme test." Actual control is, of course, evidence of right of control. Unless evidence of actual control exercised over other persons similarly situated is admissible then a person whose employment was so recent as to exclude opportunity for actual control to be exercised would be deprived of any means, other than the contract, of proving right of control.

We will now recite evidence of actual control which appellant exercised over Mr. Cargile and other persons similarly circumstanced, to wit, Mr. Wheeless and Mr. Behrman, all district managers.

District managers were required to personally pick up their papers shortly after they came off the press. The purpose for this was to achieve early delivery, to get them out of the way, and as Mr. Granath stated: "The supervision of his carriers, to see that the boys were up, to wake them up if necessary, to make good delivery." The time for delivery of papers was fixed by the management. Each district manager was required to call the newspaper office at specified times to inquire about customer complaints regarding delivery or nondelivery of papers. District managers were not permitted to alter the time or method of handling these complaints; they were required to be personally attended to by such managers. District managers were not permitted to act for each other in the matter of complaints.

District managers were controlled by appellant in the selection of carriers. They were required to employ young boys, not men.

In some areas, district managers were required to place the newspaper on the subscriber's porch, regardless of weather.

District managers were required to file with appellant bills showing how many papers were delivered to each carrier and how much was paid for them. With references to prices the evidence shows that appellant rigidly controlled the price district managers paid for papers, the price such managers charged carrier boys for the papers, and the price subscribers must pay for papers. Nor was the price to all district managers the same.

The size and location of delivery districts were changed by appellant at will and without regard to the wishes of the district managers. In this way their compensation was controlled.

District managers were required by appellant to keep a special set of books showing how many papers were actually delivered to subscribers. This was essential to it for the purpose of pricing and selling advertising space.

District managers were not allowed to deliver handbills or circulars along with papers.

Appellant instructed district managers to sign all carrier boys to contracts, forms for which it furnished, without cost, for this purpose. It also furnished district managers and carrier boys, without cost, receipt pads used in collecting for subscriptions.

District managers were required to conduct three or four sales drives each year, the details of which including quotas and prizes were determined by appellant. Salesmanship schools were conducted by appellant and district managers and carrier boys were required to attend. Sometimes the Austin High School facilities were used for this purpose and a school teacher was used as a sales instructor. These arrangements were presumably made by appellant as the district managers did not make them.

District managers were required to deposit appellant's portion of collections in a special bank account and to deliver deposit slips to appellant. All managers were required to be bonded. They were required to devote their full time and efforts to their job as district manager. They worked for only one newspaper and supervision of their work is a daily occurrence Mr. Fincher testifying, " * * * we suggest and try to supervise and get with these people (district managers and carrier boys) every day to inspire them to make more money and to do a better job."

In concluding this recital of the evidence of control exercised by appellant over its district managers and carrier boys we quote the testimony of Mayes Behrman:

"A    I told Mr. Granath that it seemed to me—this occurred in the first summer of my work there—that

it seemed to me that we were being much more controlled than the terms of the contract allowed, and his response to me was that —he said, 'Behrman, you should know by now that contract is not worth the paper it is written on. It is meant to protect the company.' "

The evidence reflects that the income of newspapers is derived approximately eighty per centum from advertising and the balance from sales of newspapers and that the value of advertising space is based primarily, if not solely, upon circulation. In short, if newspapers were all sold to one person and not circulated, ownership could not survive. Circulation is the lifeblood of newspapers.

■    The interest of newspaper management in all aspects of newspaper sales, distribution and circulation is of a vital character. That it guards, supervises and controls such interest is normal and to be expected. It is our opinion that the evidence to which we have referred is sufficient evidence, measured as it is our duty to measure it, to sustain the findings of the jury that Mr. Cargile was an employee of appellant and was not an independent contractor.

Unless the evidence in this case justifies a finding that appellant has exercised and has the right to exercise control over the details in which district managers perform the service for which they have been employed, then we cannot conceive of any case when the evidence would suffice for such purpose. Appellant does not point to any evidence as to any detail of Mr. Cargile's work which it does not control. It does not suggest that there are any such details, and we are unable to think of any.

Appellant relies principally upon the cases of Carter Publications v. Davis, 68 S.W.2d 640, Waco Civil Appeals, writ ref., and Mid-Continent Freight Lines, Inc. v. Carter Publications, Inc., 336 S.W.2d 885, Ft. Worth Civil Appeals, writ. ref. and Davis v. General Accident Fire & Life Assur. Corp., 127 S.W.2d 526, Beaumont Civil Ap-

peals to sustain its contention that Cargile was an independent contractor.

In Carter Publications v. Davis, supra, there was a written contract between the paper and one Dickinson whereby Dickinson contracted to deliver papers mostly to dealers in outlying towns, but there were some deliveries to subscribers. Dickinson orally agreed with one Heath to make the deliveries for him. We quote from the opinion:

"The written contract above set out does not give the employer the control or the right to control with respect to Dickinson's physical conduct, or that of his employees, in the performance of the work provided for in the contract. In fact, it provides that Dickinson shall employ his own help and shall control all ways and means relating to the proper performance and completion of the work provided for in the contract. Clearly, under the terms of the written contract, Dickinson was an independent contractor. * * *

"The appellee contends that there was evidence sufficient to show that Carter Publications, Inc., actually assumed and exercised control over Dickinson and Heath with reference to their physical conduct in the performance of the labor provided for in the contract, and that by reason thereof Heath became appellant's servant, even though the written contract did not so provide. The evidence most favorable to appellee on this phase of the case is as follows: Mr. Grace, manager of the circulation department of appellant, testified that occasionally he made a casual inspection to see if there were any flat tires on the automobiles that were on hand for use in making delivery of papers; that, if those who had contracts for delivery of papers had been negligent or derelict in handling papers, and had not made delivery until several hours after the papers were due, he would not have permitted them to continue under their contracts. Mr. Dickinson testified that, before entering into the contract Mr. Grace required assurance from him that a good automobile would be provided for making deliveries; that on one occasion a dealer in Hillsboro complained because the papers were not being delivered at an earlier hour; that Grace took the matter up with Dickinson to ascertain why the papers were not being delivered at the hour demanded by the dealer, and, upon being informed that the papers could not be delivered as early as demanded without injury to the automobile, Grace replied: 'If that is the way it is, don't tear up your car.' The above evidence is not sufficient to indicate the exercise of such control by the employer as to create the relation of master and servant. Such evidence merely shows that the employer was exercising control to see that the work was being performed and results accomplished according to the terms of the contract. As we understand, an employer has a right to exercise such control over an independent contractor as is necessary to secure performance of the contract according to its terms and to accomplish the results contemplated thereby without thereby creating the relationship of master and servant, so long as the employer does not destroy the employee's power of initiation nor undertake to control the employee in the means and manner of the performance of the work."

Cases of this character and questions of this nature must necessarily be decided upon their own peculiar facts and circumstances. Seldom are two such cases identical in their facts. In Carter Publications v. Davis, the principal object to be achieved by the contract and the employment of Dickinson was transportation of papers to nearby towns. Some subscriber delivery was permitted, but this seems to have been of minor importance.

We do not believe that the nature of the contract in Carter Publications v. Davis and

the extent of control exercised by the paper over Dickinson is fairly comparable to the contract here and the control exercised by appellant over its district managers.

Davis v. General Accident Fire & Life Assur. Corp., supra, was another case in which the newspaper contracted with Davis to transport its papers from Beaumont to Lufkin and intermediate points. Papers were delivered at such places in packages to "agents" of the newspapers. The holding of the Court was that Davis was an independent contractor, principal reliance being placed upon Carter Publications v. Davis, supra.

In Mid-Continent, supra, a written agreement between the newspaper and one Cherry provided for the delivery of papers, mail sacks and agent's bundles over a route from Denton to Pilot Point, Collinsville, Whitesboro, Gordonville, Tioga, Callisburg, Gainesville, Lindsay, Myra, Muenster, Era, Valley View, Sanger and intermediate points, deliveries to be made seven days per week. Under this contract Cherry delivered papers to dealers and post offices but he had the privilege of delivering papers to individual subscribers. The contract provided that Cherry was an independent contractor and that "Within said route, Party of Second Part chooses his own hours of work, his own way of travel, his own kind and method of transportation, chooses, pays and discharges his own assistants, and assumes and pays all and every expense whatsoever connected with the foregoing matters, with no reimbursement whatsoever therefor from First Party."

We quote further from that opinion:

"Cherry was shown his route by his predecessor. He, however, could have worked the route 'backwards' or in any way in his best judgment the bundles and mail sacks would be timely delivered; he was shown where to drop the bundles but the drop places were up to the dealer in each town; he was told to drop the mail sacks at the post offices in the towns; he was told not to put papers in mail boxes as that would be a violation of the law; he was required to fill out a 'Special Transfer Statement' each month; it was 'suggested' he collect from his individual subscribers monthly; he was not supposed to put circulars in papers; he was told what time the papers would be dropped in Denton and he was supposed to be on time to start his route; defendant would 'fuss' at route men for putting circulars in papers, and would 'fuss' if mail sacks or bundles were not delivered at the proper destination; a route man would be 'fussed' at if he delayed delivery of the bundles and sacks while delivering his individual papers; for such conduct a route man could be fired; defendant had a right, never used, to stop papers in route if the dealer had not paid for them; a route man had no right to go into another route man's territory; if Cherry had been consistently late in delivering papers his contract could have been terminated; Cherry was supposed to sell papers at the suggested price, and if he had overcharged, his contract could have been terminated; Cherry's predecessor, Hinzman, testified that defendant told him ' * * * that I had to make a certain schedule to the other agencies, and I had to get there whenever the papers got there and everything, where I could make the schedule, because the other agents around the cities had to have their papers in time.' The witness was asked, 'On what occasions did Mr. Davis (circulation representative) contact you, and for what reasons did he contact you during the time you had the route?' He answered, 'Well, he would come up and see how I was doing, and if I needed him on advice, why, I would call him or let him know, and he would come and contact me.'

"Defendant did not withhold any kind of taxes from Cherry's checks and did not carry Workmen's Compensation

or other insurance for his benefit; if Cherry's route had been increased it would have required the making of a new contract; Cherry was not required to use defendant's receipt books but used them as a matter of convenience; none of defendant's agents ever went with Cherry on his route; Cherry furnished his own car or truck and paid all expenses; he hired and paid for whatever extra help he needed."

The Court held:

"Defendant had a right to exercise such control over Cherry as was necessary to secure performance of the contract according to its terms and to accomplish the results contemplated thereby without thereby creating the relationship of master and servant, so long as defendant did not destroy Cherry's power of initiation nor undertake to control him in the means and manner of the performance of the work. 23 Tex. Jur. 547. We think the evidence merely shows that the defendant was exercising control to see that the work was being performed and results accomplished according to the terms of the written contract."

Chief Justice Massey dissented from this holding on the ground that the evidence presented an issue of fact as to the relationship between Cherry and the paper. The action of the Supreme Court, however, negatived any weight being attributed to such dissent.

The contract in this case is similar in its basic objective to the contract in Carter Publications v. Davis, supra. The principal duty of Cherry was to deliver bundles of papers to dealers and post offices. Individual distribution was of incidental or minor importance. None would gainsay the fact that papers delivered to a common carrier for transportation from one point to another would not make the carrier an agent of the shipper. The obligation of Cherry under the contract was to transfer and deliver papers in bulk, the same service a common carrier would perform if it conveniently traversed the route followed by Cherry. This fact and the fact that the extent of control exercised by the paper over Cherry is far less and far less detailed than the extent of control exercised by appellant over its district managers prevents the holding in Mid-Continent from having conclusive effect here.

We believe it highly significant that the three Texas cases involving the relationship of newspapers and their carriers are cases primarily dealing with a newspaper and its bulk carriers, as distinguished from carriers delivering papers to individual subscribers.

Cases from other jurisdictions which support the conclusion we have reached on this question are: El v. Newark Star-Ledger, 131 N.J. 373, 36 A.2d 616; Hann v. Times-Dispatch Pub. Co., 166 Va. 102, 184 S.E. 183; Dispatch Pub. Co., Inc. v. Schwenk, 109 Ind.App. 223, 34 N.E.2d 150; Femling v. Star Pub. Co., 195 Wash. 395, 81 P.2d 293; Salt Lake Tribune Pub. Co. v. Industrial Commission, 99 Utah 259, 102 P.2d 307; Burlingham v. Gray, 22 Cal.2d 87, 137 P.2d 9 and Hearst Publications v. United States, D.C., 70 F.Supp. 666, affirmed 9 Cir., 168 F.2d 751.

A review of the facts and holdings in these cases would unduly extend the length of this opinion. We have read each of those cases and, in our judgment, they establish the relationship of employer and employee in newspaper-carrier and vendor cases under circumstances reflecting no more control by the paper than exists in this case.

We only wish to refer to Hearst Publications, supra, in which the Court emphasized that news vendors, in selling papers, " * * were performing personal services constituting an integral part of the business operations of the employer, were not pursuing any separate trade, business or profession * * *."

This description is peculiarly applicable to appellant's district managers.

We have recently considered and discussed this general question in Sartain v. Southern National Life Ins. Co., Tex.Cr.App., 364 S.W.2d 245, in which we held that an insurance agent was not a servant of the company in driving a car to reach a place where prospective insureds might be interviewed so as to make the company liable for his negligence in operating the car. We followed prior decisions which hold that this relationship is in a special class, not calling for the rendition of personal services but for the achievement of a result which places it in the independent contractor classification.

We believe that appellant's district managers who render so many vital services for it were properly found by the jury to be its employees, and we, accordingly overrule Points 1–6, inclusive.

Appellant's seventh Point is that the Court erred in inquiring of the jury whether it "retained or exercised the power to control" Mr. Cargile over its objection that "* * * the true test is whether or not the alleged employer has the power to control and the usurpation of such power does not make the relationship between the parties one of employer and employee. * * *"

Explanation of this point is made by appellant in its brief as follows:

"The issue as submitted to the jury permitted an affirmative answer if appellant—no matter how wrongfully—exercised control over the details of the work. There is thus presented the right to control under the agreement between the parties as opposed to the exercise of the power to control, despite the fact that no such right is retained or exists."

Appellant quotes from King v. Galloway, 284 S.W. 942, Tex.Comm. of App., as follows: "In the first place, it must be borne in mind that on the question of control, the test is not the exercise thereof, but the right to exercise such control."

The invalidity of this point is easily demonstrated. It would subordinate reality to unreality; the tangible to the intangible. It would have us hold, in effect, that it is more important to have the right to eat than it is to eat.

The very case from which appellant quotes also quotes, with approval, from other authorities this statement, "No better test can be applied than to say that the relation of master and servant exists where the master retains *or exercises* the power of control * * *." Italics added.

■■ The right to exercise the requisite control may establish the employer-employee relationship even though such right is never implemented. When such right is actually exercised the relationship is, a fortiori, also established. If an employer usurps his own authority, as appellant suggests it has done, and instructs an employee with regard to the performance of his duties and such instructions are followed we think the employer would be estopped, certainly as to strangers, to say that such instructions were unauthorized.

Appellant's eighth Point complains of argument made by appellees' counsel to the jury. We will set out all of such argument and the attendant circumstances.

The arguments complained of, in context, are:

"* * * But it is not fair, as counsel said, to say, give Mr. Love $140 for what this man went through. How would any of you like to go through it for $140? * * *"

"* * * What total amount will it take to compensate that child for seventy-two years? If you think your figure is big when you arrive at it, divide it by seventy-two, and swap places with her, or put your child in her place. * * *"

"I don't know,—there are many ways to look at the thing. What would you want your child to have; what do you

think is fair for other people's children to have,—but really the fairest thing is just sit down, without any passion, without any prejudice, without any feeling, and just financially, mathematically, economically, calculate this child's damage,—and Mrs. Love's too. Use pencil and paper, and if you need pencil and paper, you can ask the bailiff, and he will get it for you. But try to be as scientific as you can. * * *"

" * * * And I don't know of any other way to figure any of these damages. You can't just pull them out of a hat; you can't just guess at them; you can't just close your eyes and draw a plot. You have to do your best to arrive at them scientifically in some manner. And I don't know any better way to do it than this way. If you do, by all means do it. But try to be as scientific and as mathematical and as accurate as you can * * *"

" * * * Well, whatever it should be, figure it in some mathematical form. Figure it as best you can scientifically * * *"

■ None of these arguments was objected to by appellant when they were made. Neither counsel for appellees nor the Court were afforded an opportunity to erase erroneous impression, if any, which the jury may have received from it. Unless an argument is patently improper and of such a harmful nature that an instruction from the Court, following an objection, could not alleviate its prejudicial effect upon the jury, reversal should not result. Texas General Indemnity Co. v. Bridwell, 304 S.W.2d 131, Beaumont Civil Appeals, writ ref., n. r. e.

■ It is our opinion that the above argument does not, if improper, fall in the "incurable" category. All in all, we believe it called upon the jury to render a dispassionate, objective, but fair verdict.

In our opinion, this argument was not improper. If it was improper, appellant waived its right to complain of it because of its failure to object.

Appellant's ninth and twelfth Points also complain of argument of appellees' counsel made to the jury. We quote such argument and show its environment, as pertinent to Point nine.

In his closing argument to the jury appellees' attorney urged that Special Issue No. 1 be answered "yes"—in effect that Cargile was appellant's agent or servant —and that Special Issue No. 2 be answered "He was not an independent contractor." He then told them "and it is true that the newspapers will not even be involved in the suit unless you answer No. 1 'Yes' and 'He is not an independent contractor,' to No. 2."

He further said in that argument: "In closing I would like to say that as far as I am concerned, I would rather—and I address this to each one of you individually —rather than answer these questions any other way 'Yes' to No. 1, and 'He was not an independent contractor,' to No. 2, I would rather you hang this jury and make us try it again."

This argument was not objected to when made.

Counsel for appellant had, prior to the above argument, told the jury:

" * * * Now, I have about taken all the time I can on that feature of it, and yet I think it is very, very important, because the whole attempt here is to try to show that C. E. Cargile was an employee and not an independent contractor of Newspapers, Incorporated, in order to get at Newspapers, Incorporated.

* * * * * *

"Now, in order for counsel to prevail in this case, you have got to stretch that collision from that place out on the Bastrop Highway into the office of Newspapers, Inc., and it is going to take a great deal of stretch-

ing. In fact, an impossible amount of stretching,—before you can lay the blame either at Mr. Cargile's door, but much less at the door of Newspapers, Inc. * * *

" * * * I think beyond any question that they have failed to bridge that gap between the collision out on the Bastrop Highway and Newspapers, Inc., first, because they have failed to show that Mr. Cargile was an employee and not an independent contractor; and that is what they hired out to do * * "

As to Point twelve, the record shows that in his argument to the jury appellees' counsel properly stated that there could have been several proximate causes of the collision and he correctly predicted that appellant's counsel would argue that Mr. Cargile's conduct was not to any extent a proximate cause. He then stated that appellant's attorney would say that in order that Mr. Cargile's act could be any part of the cause, "even one per cent of the collision" he must have anticipated the chain of events that culminated in the collision. He then pointed out that several things could have caused the collision, and he told the jury, "Now, you might say one was ninety per cent, one ninety-nine per cent, and one just one per cent, and it could very well be that way." He then continued, "Now, what the Court is asking you to do here is not to say how much do you want Newspapers, Inc., to pay the Loves, or how much do you want somebody else to pay the Loves, or anything of that nature, or how much would you want a judgment entered against Franklin * * * That is not it. The Court asks you for a total damage award. He asks you to find the total damage, the total amount of money that it will take to compensate for the damages spelled out in each one of these issues. Then he will take that total and apply the law and see who caused this thing, and then he will enter a judgment on the basis of what the law calls for. So if you start trying to enter a judgment and adjust the total and the Judge has to

accept your figure as the total amount of damages. * * * Then when he starts entering judgments against one party or another, then he applies the law. * * * And then he will enter a judgment, whatever it calls for, against Newspapers, or any other party."

■ Appellant's complaint is that by the argument made by appellees' counsel (Point nine) the jury was informed of the effect of their answers to the issues concerning the relationship Mr. Cargile bore to the newspaper.

It is clear, we believe, that appellant threw the first stone in this respect. The statement that it was incumbent to show Cargile to be an employee of appellant and not an independent contractor in order to "get at" appellant very plainly informed the jury that unless Mr. Cargile was an employee appellant would not be responsible for his actions. It was not error, under these circumstances, for appellees' counsel to make a similar argument.

We are also of the opinion that enlightened juries such as sit in our Courts today would be presumed to know the significance of their answers to these issues.

■ We copy appellant's argument made in support of his twelfth Point:

"The vice in the argument complained of in the 12th Point is so subtle that unless that portion of the argument is considered in toto it could not be considered to be erroneous. Considered alone and without reference to the context there is hardly a one of the statements that can be considered to be improper. Despite this fact, however, it cannot be doubted that the argument was intended to leave the impression that the total judgment would be apportioned between or among those found to be at fault and if Cargile was only slightly to blame appellant would be required to pay only a part of the total dam-

ages. There is no other satisfactory explanation for the statement regarding a party's being 1% or 90% or 99% at fault. Obviously, of course, counsel's own mental processes in making the argument cannot be considered."

If appellant was of the opinion that the jury might be mislead by the argument here complained of it was its duty to object to the argument in order that clarification might be made. This was not done. We do not believe such argument was incurable.

It is our further opinion that if any of the argument made by counsel for appellees was improper that it was harmless error under Rule 434, T.R.C.P.

The eleventh Point also relates to jury argument.

Counsel for appellant made the following argument to the jury:

"* * * They called in these two former district managers; and, incidentally, there are twenty-one down there. I think unquestionably they would not feel free to come up and criticize the management, but over the years there has been others down there who severed their connection with Newspapers, Inc., and certainly if there had been any great breach of this contract by Newspapers, Inc., it would have been possible to get more than those two. In other words, there have been eight or nine altogether, and Mr. Byrd frankly admitted he tried to see them all. I don't know whether it was the same two investigators that he had on Mr. Cargile's trail, or whether he was doing this personally; but he said in effect that he tried to get them all. * * *"

Following such argument, counsel for appellees told the jury:

"* * * There has been eight (District Managers) dismissed, and I tell you for sure I contacted as many as I could—four or five, and it is not my duty, I am not obligated to tell you what happened, but you would be surprised at the pressure the paper boys around there * * *"

Counsel for appellant objected to this argument and requested the Court to instruct the jury to disregard it. The Court complied and instructed the jury to "disregard and not consider for any purpose the statements just made by counsel with respect to his contact with other persons."

Thereafter, counsel for appellees made the following statement to the jury which was not objected to by appellant:

"And I am proud that I found Mr. Behrman and Mr. Wheeless, who were not afraid, and who came in here and told you what they knew and nothing else. But how can you get away from the fact that they can't even get their own friends and employees to support what they say? Not one out of twenty-one men, or one out of 200 children? * * *"

It is our opinion that the argument first made by appellees' counsel was in fair response to the previous argument made by counsel for appellant if, as we assume, the factual statements made by counsel for appellant in his argument were not supported by evidence. Appellees were under no duty to bring any district manager, present or past, to Court to testify for them. Neither were they subject to criticism for not producing them or any of them as witnesses. They had no control over them.

Appellant having gone out of the record to unjustly criticize appellees in this respect, their attorney, in fairness, had the right to reply in like vein and to discuss and explain, within bounds, the matters improperly introduced by opposing counsel. McDonald, Texas Civil Practice, Vol. 3, Sec. 13.14.

It is also our opinion that the instruction of the Trial Court expiated any error which may have been committed. As to the argument made subsequent to this instruction, it is our opinion that it constituted a fair comment upon the appearance and conduct of the witnesses Behrman and Wheeless. Furthermore, in the absence of objection, any error in this argument was waived. It was also harmless error, if any, under Rule 434, T.R.C.P.

Points thirteen through fifteen are that there was no evidence to support the jury findings that Cargile's failure to keep a proper lookout and his action in turning left across the highway without giving any signal were proximate causes of the collision.

Point sixteen is that the Court erred in refusing to define "similar event," as used in the definition of proximate cause in the charge in accordance with appellant's requested instruction.

These points are jointly briefed.

At the time and point of the collision, the Bastrop Highway was a three lane highway, each lane being 12′ wide. It was raining. The streets were wet and the shoulders were muddy. It was dark enough for cars to be using their lights.

The Love car was traveling in a northerly direction, towards Austin, and was in the east lane. Both the Cargile and Franklin cars were traveling in a southerly direction, towards Bastrop. Mr. Cargile, in his jeep, had just entered the Highway from Pierce Drive, after having delivered a paper published by appellant to Mr. Pierce, a subscriber, on Pierce Drive. He was, until he changed lanes, driving in the outside or west lane. The Franklin car was, until it turned towards the outside lane in order to avoid hitting the Cargile car, traveling in the middle lane. Franklin had been drinking beer, but a blood test taken after the collision did not show him to be "what is considered intoxicated." Mr. Franklin testified that he was driving forty-five miles

per hour. Other witnesses placed his speed at seventy or over miles per hour. The legal speed limit at the time and place was forty-five miles per hour.

When the Franklin car was two or three car lengths behind the Cargile jeep the jeep, without warning, commenced a left turn into the path of the oncoming Franklin car. We quote the testimony of Mr. Franklin regarding the events which followed:

"A As I was going along the highway, I crossed the rise, and as I came out in this little flat area, I saw this slow-moving vehicle on the extreme right-hand lane.

"Q What lane were you in?

"A I was in the middle lane going towards Bergstrom.

"Q Had you been in the middle lane all along?

"A Yes, sir, And I thought that I could go straight on by him in this middle lane, and just as I was anticipating going by him in the middle lane a little ways back, he started angling over into my lane. And I knew he was going at a slow rate of speed, and if I kept going in the middle lane that I was going to hit him. And I looked up ahead, and I saw oncoming lights on a vehicle. I knew if I got in the extreme left lane that I would have a head-on collision with this vehicle that was coming. So I lightly touched my brakes and tried to go to the right. I couldn't get around him on the right, so I must have went off the pavement a little bit, and then my car got out of control. That is about the last that I remember."

In attempting to pass the Cargile vehicle on the right, the Franklin car went partially off the pavement and on to the muddy shoulder. The car then skidded broadside about 130′ when it collided with

a barricade about 4 or 5 feet off the pavement which had been placed there by highway construction workers. After striking the barricade, the Franklin car traveled another 148' across the west and middle lanes of the highway and collided head-on with the Love car, the point of impact being in the outside or eastern lane.

Mr. Cargile testified that he did not see the Franklin car until it went by him on the right side.

■ The negligence of Mr. Cargile is evident, and no contrary contention is made.

■ Ordinarily, the issue of proximate cause is a question of fact for the jury. Negligence Sec. 165, Tex.Jur.2d, Vol 40.

In Texas Co. v. Grant, 143 Tex. 145, 182 S.W.2d 996, the Court said "Cases in which proximate cause is determined as a matter of law are few, and we do not regard this as one of them."

The facts in Grant are not similar to those presented here, but we reach the same conclusion.

"Foreseeability" is an element of proximate cause. The Court charged the jury here that, "To be a proximate cause of an event, the cause must be such that a reasonably prudent person, in the exercise of ordinary care, should have reasonably foreseen or anticipated that such event or some similar event would follow such cause as a natural and probable consequence."

One of the leading cases discussing the meaning of "proximate cause" and "foreseeability" is Sullivan v. Flores, 134 Tex. 55, 132 S.W.2d 110, opinion by Judge, later Chief Justice, Hickman. There the driver of a car negligently turned left and was struck by a car coming from behind. A spare tire was dislodged from the careless car, rolled down the street and struck a child standing at the curb. Regarding the foreseeability of this chain of events, Judge Hickman stated:

"We are unable to concur in this conclusion. The jury found that Flores

negligently turned his taxi-cab into the path of Marshall's approaching car, resulting in a collision. We are not prepared to hold, as a matter of law, that he should not have anticipated injuries to persons in the vicinity of such a collision. Of course, he could not have anticipated the exact nature of such injuries, but liability does not depend upon his having been able to do so. It is sufficient if he should have anticipated an injury of the general nature of that suffered by this minor. It is, no doubt, unusual for a spare tire to be knocked from its setting and put in motion by a collision, but that fact does not exonerate the negligent driver from liability. As a person of ordinary intelligence and prudence, he should have anticipated the danger to others created by his negligent act, and the rule does not require that he anticipate just how injuries will grow out of that dangerous situation."

See also Biggers v. Continental Bus System, Inc., 157 Tex. 351, 298 S.W.2d 79, 303 S.W.2d 359.

Certainly, it seems to us, the events here were no more unlikely to occur than in Flores. As a matter of fact, we believe that it is a matter of common knowledge that any movement of a vehicle in traffic may affect or have a bearing upon the conduct of operators of other vehicles in the vicinity.

The only feature of this case which may seem strange or unusual is the fact that Mr. Cargile's car did not strike the Love car, and was not itself damaged. This same situation is found and liability was established in Southwestern Greyhound Lines, Inc. v. Wafer, 208 S.W.2d 614, Eastland Civil Appeals, writ ref., and in Firestone Tire and Rubber Co. v. Rhodes, 256 S.W.2d 448, Austin Civil Appeals, opinion by Chief Justice Archer.

■ It is our opinion that the collision would not have occurred but for the negligent acts of Mr. Cargile, and that the jury

finding of proximate cause has evidentiary support.

Appellant requested this instruction, which the Court refused:

"By the term 'similar event' as used in the definition of proximate cause in this charge is meant an occurrence which corresponds nearly or resembles in many respects or is somewhat like or has a general likeness to another event. In order to be similar it need not be identical, and the word 'similar' ordinarily implies allowance for some degree of difference."

Appellant cites no authority to support the contended need for defining the term "similar event." "Proximate cause" was the term being defined. It is only in rare instances that subdefinition is required. Vol. 3, McDonald Texas Civil Practice, p. 1091.

The Trial Judge has a wide discretion in defining or refusing to define words in his charge. There was no abuse of discretion here. These are words of common understanding. Point sixteen is overruled.

Point seventeen is that the verdict and judgment of $50,000.00 in favor of Connie Gail Love is excessive.

Point eighteen is that the verdict and judgment in favor of Mrs. Edna Love for $35,000.00 is excessive.

These points are jointly briefed.

Mrs. Edna Love was 24 years of age when she was injured. When she arrived at the Brackenridge Hospital emergency room, she was semi-conscious and in profound shock. Her blood pressure was very low, her pulse rate was very rapid, and she was in a critical condition. She was given blood transfusions immediately and carried directly to the operating room. Mrs. Love received cuts and bruises over her entire body, but her main injuries were a fracture of her left femur just above the knee, a very deep laceration on the front of her right thigh which extended about two-thirds of the circumference of her leg, and a very severe chemical burn extending from the lower tip of her spine to the base of her neck. She remained in the hospital about three months immediately following her injuries, and during this time skin grafting was performed on her right thigh after a large amount of damaged tissue was removed, a steel pin was placed in her left femur and traction applied, and she was put in a cast from her ribs down to her toes. When she left the hospital on July 4, 1959, she was still in the same cast.

Mrs. Love returned to the hospital on September 5, 1959, at which time her cast was removed, and she was allowed to sit up in a wheel chair. She began using crutches on December 19, 1959, and by January 30, 1960, she could walk in a very limited manner with a marked limp.

As a result of her injuries, Mrs. Love will never be as well physically as she was before she was injured. Both of her legs are weaker than they were before, her left leg swells between the knee and ankle if she stands on her feet any substantial length of time. She is unable to squat down because her left leg will not bend enough at the knee (only 90 degrees). She has pain in her leg after being on her feet and her right leg is numb between the knee and ankle. She has a deep, ugly scar on the front of her right thigh just above the knee, and she has scars on her back where she was burned.

Mrs. Love has reached maximum improvement, and all of the disabilities enumerated above are permanent.

In addition to the general award of damages of $35,000.00 awarded Mrs. Love she was awarded $3,154.45 for past medical expenses.

Connie Gail Love was about six months old when she was injured. When she arrived at the Brackenridge Hospital emergency room, she was semi-conscious, her head was greatly swollen and bruised, she

had complete paralysis of her left side along with other signs indicating a severe injury to the head. Blood had collected beneath her scalp, requiring a blood transfusion. Her brain was severely bruised. She had multiple fractures on both sides of her skull; the edges of the fractured bones were pulled apart; the growth line of her skull was torn apart.

Connie Gail remained in the hospital about two weeks, during which time she was under constant medical observation. She was then discharged into the custody of her grandmother. She was returned to Austin in July of 1961, at which time she had a complete neurological examination—including electroencephalography. The EEG was abnormal and it showed specific brain damage in the right rear part of her brain. Her x-rays at that time, more than two years after injury, showed that her most severe skull fracture still was not healed.

As a result of Connie Gail's injuries, scar tissue has formed in her brain from the original bruising and tearing. She now has a damaged brain, and brain cells once destroyed will never grow back or regenerate. In all probability she will develop epileptic seizures in the future, and the most probable time will be between the ages of eleven and thirteen—the time of puberty. She has a lesion in her brain and she will never have a normal brain again. All of her brain damage is a direct result of the injuries she received on April 11, 1959.

Connie Gail will probably need medical treatment for the rest of her life, and the cost of such treatment will probably run somewhere between $100.00 per year and the possible expense of complete institutional care.

In addition to the general damages of $50,000.00 awarded Connie Gail, she was awarded $5,100.00 for future medical expenses and her father was awarded $1,400.00 for her future medical expenses anticipated prior to her 21st birthday.

Appellant concedes that there are cases "in which awards of similar amounts in cases having some similarity to the present case have been upheld, and there are likewise modern cases in which juries returned a verdict for a lower amount." None of these cases is cited.

The sole basis of appellant's contention of excessiveness is that on a former trial, actually a mistrial, of this case a jury assessed these damages at a substantially lower amount.

This fact but illustrates the great latitude which a jury has in finding the present value of future damages. See Texas Consolidated Transportation Co. v. Eubanks, 340 S.W.2d 830, Waco Civil Appeals, writ ref., n. r. e.

In Louisiana & A. Ry. Co. v. Chapin, 225 S.W.2d 614, Texarkana Civil Appeals, writ ref., the Court in holding a jury verdict in a death case not to be excessive stated:

"No rule is prescribed for making the calculations. Exact ascertainment is obviously not possible. Juries from their own knowledge, experience and sense of justice are called upon to fix the compensation with reference as far as possible to conditions existing at the time of death. They are not to be influenced by passion or prejudice. The jury's estimate is not defined, but any estimate of the court is likewise undefined. The judgment of the jury is as good as that of the court, and it should prevail unless it appears that the verdict is influenced by passion or prejudice and is not the result of honest convictions."

No two juries are alike. Their different backgrounds sometimes result in different verdicts in the same case. See Benoit v. Wilson, 258 S.W.2d 134, Austin Civil Appeals, writ. ref., n. r. e., where a $23,274.80 judgment on the second trial was sustained, the jury verdict on the first trial being $14,200.00.

Factors, such as a local plaintiff of stature suing a nonresident, which normally make a jury verdict suspect for undue generosity are completely absent here. The complainants here are nonresidents. The defendant is a local resident of stature. Trial was before a local Judge and local jurors. There simply is no basis, except an arbitrary one, upon which we could substitute our judgment for the judgment of the jury and the Trial Judge.

■ Points nineteen and twenty are that the Court erred in permitting the jury to consider "physical impairment" as a separate element of damages, and to speculate as to the meaning of such term, and the elements of damage constituting it without any definition, instruction or limitation.

The Court in the damage issues submitted to the jury instructed it that "physical impairment" was a proper element of damage to be considered. This term was not defined in the charge.

Appellant objected to the term "physical impairment" as used in the charge on the ground that it was vague, indefinite and permitted the jury to speculate as to items of damages which it could consider as coming within this term, and because such term was not defined or limited. No definition of the term was tendered by appellant.

We quote from appellant's brief:

"Appellant is well aware of such cases as Mikell v. LaBeth, 344 S.W.2d 702 (Houston Civ.App.1961. Writ ref. n. r. e.); Riley v. Norman, 275 S.W.2d 208 (El Paso Civ.App.1954. Writ ref. N.R.E.); John F. Buckner & Sons v. Allen, 289 S.W.2d 387 (Austin Civ. App.1956. No writ history); [Schroeder v. Rainboldt] Dr. Pepper Bottling Co. v. Rainboldt, 66 S.W.2d 496 (Waco Civ.App.1933. Rev. on other grounds 128 Tex. 269, 97 S.W.2d 679, 1936); Texas & Pacific Ry. Co. v. Perkins, 284 S.W. 683 (Waco Civ.App.1926) writ dism.); and similar cases. Each of these cases indicates that 'physi-

cal impairment' or some similar phrase may be used in describing a compensable item of damage and appellant does not contend that the phrase if properly defined and limited would be an improper element of damages. On the contrary, compensation for what may aptly be described as 'physical impairment' is in appellant's judgment proper."

Rule 279, T.R.C.P. provides in part:

" * * * Failure to submit a definition or explanatory instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or explanatory instruction has been requested in writing and tendered by the party complaining of the judgment."

Having failed to comply with this rule, appellant cannot now complain of the failure of the Court to define the term "physical impairment." See Wenski v. Kabitzke, 257 S.W.2d 153, Austin Civil Appeals.

■ Points twenty one and twenty seven are that the Court erred in admitting testimony as to the route traveled by Mr. Cargile in delivering papers several months after the collision and in permitting Mr. Cargile to testify to the route he ordinarily took.

Mr. Cargile testified consistently that he never left the outside lane and denied that he turned left into the center lane. He did testify, however, that he always took the same route in delivering his papers. Appellees employed an investigator who watched the route taken by Mr. Cargile in delivering papers after the occurrence of the collision. The testimony of the investigator confirmed the action of Mr. Cargile in changing lanes in the manner described by Mr. Franklin.

■ We believe this evidence was admissible as circumstantially impeaching Mr. Cargile as to his testimony concerning the

route he took when the cars collided. Furthermore, this testimony was cumulative of other testimony to the same effect some of which, as to physical facts, was without contradiction. Under these circumstances the error, if any, was harmless.

Points twenty two through twenty six are that jury findings challenged as being without any evidence to support them, are so greatly against the overwhelming preponderance of the evidence as to be clearly wrong. These findings have been stated and fully discussed under the points referred to and it is our opinion, considering all the evidence, that such findings of the jury are not against the overwhelming weight and preponderance of the evidence as to be clearly wrong.

Finding no reversible error, the judgment of the Trial Court is affirmed.

Affirmed.